*Write awarded.*

---

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, *vs.* THE UNION ELEVATED RAILROAD COMPANY, Appellee.

*Opinion filed October 27, 1915.*

1. QUO WARRANTO—*power of court to vacate leave to file information.* Where leave to file an information in the nature of *quo warranto* is granted in an *ex parte* proceeding, the court may, at any time during the term at which such leave was granted, vacate and set aside the order if it is made to appear that the leave was inadvertently or improvidently granted or allowed under a misapprehension of the law or the facts.

2. SAME—*discretion in granting leave and setting aside order is subject to review.* The discretion of the trial court in the matter of granting leave to file an information in the nature of *quo warranto* and in setting aside such order on motion made during the term is not arbitrary but is a sound judicial discretion, resting upon established principles of law, and is subject to review.

3. SAME—*leave to file information is required in all cases.* Under section 1 of the Quo Warranto act leave to file an information in the nature of *quo warranto* is required in all cases, and is to be granted when "the judge shall be satisfied that there is probable ground for the proceeding."

4. SAME—*what is meant by words "probable ground," as used in the Quo Warranto act.* The words "probable ground," as used in section 1 of the Quo Warranto act with reference to granting leave to file an information in the nature of *quo warranto,* mean a reasonable ground of presumption that the charge is or may be well founded.

5. SAME—*when granting leave to file an information is proper.* Leave to file an information in the nature of *quo warranto* asking judgment of ouster against a corporation is properly granted where

the allegations of the petition show reasonable ground for believing that the corporation has abused its corporate rights and privileges, not only by making a fraudulent and fictitious issue of its capital stock and bonds and increasing its indebtedness with intent to evade the constitution and laws of the State, but also by failing, for more than ten years, to exercise any of its corporate functions, powers, privileges or rights.

6. SAME—*when order granting leave to file information should not be set aside.* If a petition for leave to file an information in the nature of *quo warranto* shows probable ground for granting the leave, and leave is granted, the order granting such leave should not be set aside upon motion supported by affidavits which amount merely to a denial of the allegations of fact in the petition and of fraudulent intent to evade the law, but the proper practice in such case is to deny the motion and require the respondent to demur or plead to the information, as it sees fit.

7. SAME—*when objection that information is based on matters not in the petition is not before a court of review.* Section 4 of the Quo Warranto act points out the manner in which defects or imperfections in an information may be taken advantage of, and until that method has been pursued and the sufficiency of the information passed upon by the lower court, an objection that the information is based upon matters not set up in the petition for leave is not before a court of review.

8. SAME—*when laches cannot be imputed to State—exceptions.* *Laches* in the filing of an information in the nature of *quo warranto* cannot be imputed to the State except where there is a mere defect in the formal organization of a corporation, acquiesced in by the State, or where the proceeding is for the benefit of a private relator, or where the legality of the organization of a municipality is questioned and injury to the public may result from assertion of the rights of the State.

APPEAL from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

This was a petition for leave to file an information in the nature of *quo warranto* by the State's attorney of Cook county against the Union Elevated Railroad Company (hereinafter called the Union Elevated Company) to procure a forfeiture of its corporate franchise and privileges for alleged violations of its charter rights and the constitution and laws of this State. At the time the peti-

tion in question was filed a similar petition was presented against the Union Consolidated Elevated Railway Company, (hereinafter called the Consolidated Company,) and like proceedings were had on both petitions, so that it has been stipulated that but one brief should be filed for both cases. The court granted the prayer of the petition and allowed the informations to be filed, but subsequently, on the motion of respondents, vacated and set aside the order granting such leave and dismissed the petition. This appeal followed.

As both cases involve the same questions they will be considered together and disposed of in one opinion, but a separate order will be entered in each case.

It appears from the record and proceedings in this case that in July, 1913, the State's attorney of Cook county presented his petition for leave to file informations in the nature of *quo warranto* against these two corporations, which was allowed and the informations filed, and that the order granting leave was subsequently vacated and set aside and the petition dismissed without prejudice to the right of the State's attorney, at any time thereafter, to present another petition against the respondents. From this order the People prosecuted an appeal to this court, which affirmed the judgment of the lower court in *People* v. *Union Consolidated Elevated Railway Co.* 263 Ill. 32, where the reasons for our decision and our views as to the principles of law involved on the questions then before the court are fully set forth and need not be re-stated here, in so far as this case involves similar questions of law. After the decision was rendered in the former case, and on May 27, 1914, the State's attorney of Cook county presented the petitions in this case to one of the judges of the circuit court of that county, in one of which petitions the Union Consolidated Company and in the other the Union Elevated Company were made sole defendants. Upon the presentation of the petitions leave was granted, the informations

were filed and process ordered issued. On June 2, 1914, and at the same term at which the leave was granted, the respondents entered special and limited appearances in each case and moved the court to vacate the orders granting leave to file the informations and to dismiss the petitions, supporting the motions in each case by affidavits. A hearing was had on these motions on June 26, 1914, and the court announced the motions would be allowed, but no order was entered at the time as the State's attorney requested ten days' time in which to file counter-affidavits and to apply for a rehearing. On July 6, 1914, counter-affidavits were filed in each case and a final hearing was had, at the conclusion of which the court entered the orders vacating the orders formerly entered granting leave to file the informations and for process, abated the proceedings and dismissed the petitions in each case. As the petitions and affidavits in each case are similar and the questions involved in each case are the same, the substance of those filed in but one of the cases (the Union Elevated Company case) will be stated.

It is alleged in the petition filed in the Union Elevated Company case that the latter company was organized in November, 1894, under the law of this State known as the Railroad Incorporation law, with a capital stock of $5,000,000, divided into 50,000 shares of the par value of $100 each; that the company issued and now has outstanding all of its capital stock, of the par value of $5,000,000, and that it also issued and now has outstanding bonds of the par value of $5,000,000, and that its entire capital stock of $5,000,000 and bonds to the amount of $4,387,000 were issued to the Loop Construction Company (hereinafter called the Loop Company) for the purpose of procuring the right of way and constructing and equipping the elevated railways of the Union Elevated Company; that the actual cost of procuring such right of way and con-

structing and equipping the said railways did not exceed $2,277,551.

The petition further alleges that during the years 1911 and 1912 the city council of the city of Chicago, at the request of the Union Elevated Company and other elevated railways in the city of Chicago, appointed a committee for the purpose of making a report on the valuation of the elevated railroad properties in the city of Chicago, including those of respondent, and that on May 8, 1913, the committee made its report, based upon what it would cost to reproduce the same as of January 1, 1912, and that the cost of reproducing such properties, including the equipment and right of way of the Union Elevated Company as of that date, did not exceed $2,277,551; that the actual cost of procuring the right of way and constructing and equipping the Union Elevated Company did not exceed the estimated cost of reproducing the same as of January 1, 1912, as found by said valuation committee, and that in an official report made by the Union Elevated Company to the New York Stock Exchange, made for the purpose of having its bonds listed on that exchange, its officials stated "the cost of the road equipment, right of way and construction, including power house equipment, was $3,925,000,"—an amount greatly in excess of the true cost of the right of way, power house, construction and equipment of such railway.

The petition further alleges that Charles T. Yerkes was president of the Union Elevated Company at the time of its construction and in 1898 and 1899, and that the Loop Company was organized by him, and his associates acting under his control, to build the Union Elevated railroad; that at that time there was in existence a company known as the Columbia Construction Company, created and controlled by Yerkes and his associates for the purpose of constructing and equipping the Northwestern Elevated railroad, and another company, known as the West Side

Construction Company, created for the purpose of constructing and equipping the railways of the Metropolitan West Side Elevated Railroad Company and of the Union Consolidated Company; that $5,000,000 of the par value capital stock of the Union Elevated Company was issued and delivered to the Loop Company without any actual consideration whatever or receiving any money, labor or property in payment of the same, and that the entire cost of building and equipping the railroad, including reasonable profits, overhead expenses, legal expenses, cost of right of way, construction and equipment, and other reasonable costs and charges, was paid by the Loop Company out of the proceeds of the sale of the bonds of the Union Elevated Company, and that, in fact, neither the Union Elevated Company nor the Loop Company received any money, labor or property as consideration for the issuance of the $5,000,000 capital stock given the Loop Company, but that $2,000,000 of the par value of said stock was given by the Loop Company to the West Side Construction Company and by it distributed to its stockholders as a bonus, and that $450,000 of the capital stock of the Union Elevated Company, of the par value of $450,000, was given by the Loop Company to the Columbia Construction Company and by it distributed as a bonus to its stockholders, and that $2,550,000 of the par value of the capital stock of the Union Elevated Company was delivered by the Loop Company to Yerkes and his associates, who were stockholders in the Loop Company; that in December, 1895, the Columbia Construction Company, in floating an issue of its stock, offered a bonus of fifteen per cent, and subsequently of forty per cent, in stock of the Union Elevated Company, and that the president of the Columbia Construction Company, who subsequently became general manager of the Union Elevated Company and was one of Yerkes' associates and accomplices in financing these properties, issued a public statement to the stockholders of the Colum-

bia Construction Company, stating that the offering of the Union Loop stock was "a pure gratuity; that the Columbia Construction Company stockholders had taken no risk whatsoever and were in nowise involved in the Union Loop enterprise."

The petition further alleges that the Union Elevated Company claims the $5,000,000 of its capital stock and the $4,387,000 of bonds were issued to the Loop Company in payment for the property received, and charges that the entire payment for the property received was made out of the proceeds of the bonds issued, and that the delivery to the said construction company of stock and bonds in the amount of $9,387,000, par value, in payment for property received, which actually cost not to exceed $2,277,551, was a mere trick or device conceived with the fraudulent intent to evade the constitutional and statutory requirements that no railroad corporation shall issue any stock or bonds except for money, labor or property actually received and applied to the purpose for which such corporation was organized, and that all dividends and other fictitious increase of the capital stock or indebtedness of such corporation shall be void, and that the same constituted a fraud upon the People of the State of Illinois, and was a mere trick or device conceived with fraudulent intent to evade said constitutional and statutory provisions by a reckless and dishonest issue of stock and bonds grossly in excess of the consideration received therefor; that the Union Elevated Company issued and placed upon the market stocks representing nothing of substantial value and bonds grossly in excess of the value of the money, labor and property received as the consideration therefor, and that through the organization and operations of the Loop Company, the Columbia Construction Company and the West Side Construction Company, and through the organization and manipulations of the securities of the Union Elevated Company, the Consolidated Company and other

companies, said Yerkes and his associates issued, transferred and manipulated the securities of the Union Elevated Company so that the said securities, or the portions thereof which represented nothing of substantial value and no money, labor or property actually received therefor and applied to the purpose for which the corporation was organized, should become a charge upon said railroad companies, which said scheme, device and manipulations were for the purpose of evading and violating the provisions of the constitution and statute above set forth and constituted a fraud upon the People of the State of Illinois; that in the consummation of said fraudulent transaction and scheme the Northwestern Elevated Railroad Company, a corporation organized under the Railroad Incorporation statute and operating in Cook county, Illinois, in 1901 purchased the capital stock of the Union Elevated Company from the then holders thereof for $125 cash per share, and thereafter caused to be certified and delivered to it the remaining $613,000 of first mortgage bonds of the Union Elevated Company; that of these bonds 95 were sold for cash at par or over, 43 were issued in exchange for an equal number of bonds of the Lake Street Elevated Railroad Company alleged to be of equal value, and 315 were pledged by the Northwestern Elevated Railroad Company as collateral for its notes, and the remaining 160 are still in the treasury of the Northwestern Elevated Railroad Company; that in the issuance of said $613,000 first mortgage bonds the Union Elevated Company received no consideration whatsoever in money, labor or property and that the issuance of the same was and is a fraud upon the People of the State of Illinois, and the same was done with a fraudulent intent and the same was and is a fictitious increase of the indebtedness of the corporation, in violation of the constitution and statutes above set forth.

The petition further shows that in 1901 the Union Elevated Company sold and transferred to the Northwestern

Elevated Railroad Company all of its property and since that time has owned no property and done no business, and avers that such sale of its property and cessation of business was and is a surrender and forfeiture of its franchise, rights and privileges as a corporation, and that the wrongful and fraudulent issue of capital stock and bonds was contrary to the constitution and provisions of the statutes of the State of Illinois as above set forth, and that in the misuse and abuse of its powers as a corporation the corporation has usurped, and still doth usurp, its franchises and privileges and exercises powers not conferred upon it by law, and that in the creation of a fictitious capital stock and bonded indebtedness as a basis for charging extortionate rates which the corporation has charged for the transportation of passengers and in the doing of acts which amount to a surrender or forfeiture of its rights and privileges as a corporation has rendered itself liable to judgment of ouster, and prays that the court may enter an order that the information in the nature of *quo warranto* may be filed and that process issue.

The information filed contained four counts. The first count is based on a violation of section 13 of article 11 of the constitution of 1870 and section 21 of chapter 114 of the Revised Statutes of this State by the Union Elevated Company in issuing and delivering to the Loop Company $5,000,000, par value, of its capital stock without any consideration and without receiving anything of value therefor, to be applied to the purposes for which the Union Elevated Company was created, and the issuance and deliverance to the Loop Company of $4,387,000, par value, of its bonds in payment for the procuring of the right of way, construction and equipment of the Union Elevated Company's railway lines, the actual cost of procuring such right of way, construction and equipment not exceeding $2,277,551. The second count is based upon the sale of all of the stock of the Union Elevated Company to the

Northwestern Elevated Railroad Company and the certifying and delivering to it of $613,000, par value, of its bonds without receiving any consideration whatever therefor in money, labor or property. The third count is based upon the sale and transfer, in 1901, by the Union Elevated Company of all of its property, including its railroads, power house and other equipment, to the Northwestern Elevated Railroad Company, since which time it has owned no property and done no business in the exercise of its franchises, licenses and privileges as a corporation. The fourth count is based upon the failure and omission of the Union Elevated Company for the past ten years to operate its railroads within the city of Chicago, as required by its charter, or to perform its corporate functions as such corporation.

The substance of the grounds set forth in the motion to vacate the order granting leave to file the information is, that no notice of the application for leave to file the information was given and that no probable grounds were shown for granting leave to file the information. Two affidavits were filed in support of this motion,—one by the secretary of the Union Elevated Company which sets forth that more than ninety per cent of the stock of that corporation outstanding has been retired and is now held as a muniment of title by the Northwestern Elevated Railroad Company, which in 1901 acquired the property, franchises, rights and privileges of the Union Elevated Company; that commencing with the year 1897 and ending with the year 1901 it filed its annual report with the Illinois Railroad and Warehouse Commission, in which it set forth that all of its capital stock, together with all such of its bonds as were outstanding, had been issued on account of the cost of the construction of its railroad; that since 1901 it has not filed, or been required to file, any report by reason of the sale for $6,250,000 in cash, of its property, franchises and rights to the Northwestern Elevated Railroad Company,

which owned and operated an elevated railroad that con-
nected with the Union Elevated Company's road, which
company also assumed and agreed to pay the outstanding
bonds and all other liabilities of the Union Elevated Com-
pany, the deeds and other instruments in writing evidencing
such sale and transfer being duly filed in the recorder's
office of Cook county and in the office of the Secretary of
State of Illinois at the time of the transfer, authenticated
certificates setting forth the resolution of the stockholders
of the Union Elevated Company authorizing the sale and
transfer and the resolution of the Northwestern Elevated
Railroad Company authorizing the purchase being filed
with the Secretary of State and also in the office of the re-
corder of deeds of Cook county; that the $6,250,000 was
paid by the Northwestern Elevated Railroad Company and
deposited in bank and paid out and distributed to the stock-
holders of the Union Elevated Company at the rate of
$125 per share, more than ninety per cent of the amount
of the stock being surrendered indorsed in blank, the cer-
tificates so surrendered being delivered to the Northwest-
ern Company to be held by it as muniments of title, only;
that the said stock is of no value, and that the delivering
of the certificates to the Northwestern Elevated Railroad
Company was, in substance and effect, a retirement of such
stock and always has been so considered by such company
and its officers; that in 1902 the Northwestern Elevated
Railroad Company filed with the Railroad and Warehouse
Commission its annual report, setting forth that it had pur-
chased and acquired all the rights, privileges, franchises
and property of the Union Elevated Company and held the
same as a part of its railroad lines and systems, and ever
since that time has filed like reports, and has included the
property in its annual report made to the State Auditor,
and has paid all taxes and assessments levied against the
property as the property of the Northwestern Elevated
Railroad Company. Said affidavit further sets forth that

at the time of the purchase of the property and franchise of the Union Elevated Company it held 613 of the bonds of that company that had been deposited in escrow under an arrangement by which the bonds were subject to withdrawal by the Union Elevated Company for its own use, to reimburse it for certain expenditures that might be incurred incident to the construction of its railroad; that all of the bonds were withdrawn from escrow by the Northwestern Elevated Railroad Company; that 90 of these bonds sold for more than par, 43 were exchanged for other bonds of equal value, and of the 475 still belonging to the Northwestern Elevated Railroad Company 389 are pledged as collateral security for loans made by that company. The other affidavit was by a member of an engineering firm whose business was to make valuations of railroad properties, and stated that in making the valuation of the Union Elevated Company's properties no valuation was made of its franchise or rights under city ordinances or of the promotion expenses, brokerage, construction, equipment and claims for damages, which in his judgment would aggregate not less than $2,297,000, and that adding these to the valuation as made by the commission would make the total valuation of the property $4,574,551.

Counter-affidavits of the mayor of the city of Chicago and the State's attorney of Cook county were filed, from which it appears that during the time from 1906 to 1910 the surface street railways in the city of Chicago obtained new grants for the operation of their lines, and as a basis of obtaining such grants the amount of capitalization which such companies might issue and upon which their fixed charges should be based was determined by a valuation committee selected by these companies and the city of Chicago; that for three years negotiations had been under way looking towards the unification of all elevated railways and surface lines to be operated as a whole, with the object of offering the public universal transfers between

the surface and elevated systems for a single fare ride within the city, and that as a prerequisite to carrying into effect such arrangement the amount of capitalization upon which the elevated lines would be entitled to earn returns must be determined; that such negotiations were broken off in the year 1913, for the reason, among others, of the inability of the representatives of the city and of the companies to arrive at an agreement as to the amount of capitalization which should be recognized as a legitimate basis for the fixed charges of the elevated railroad companies; that thereupon the State's attorney made an investigation of the matter, and became convinced that it was his duty to institute proceedings against each of the elevated railway companies to ascertain the amount of money, labor and property actually received in consideration for their stock and bonds issued and applied to the purposes for which such corporations were created, and that in instituting and prosecuting this suit he is acting in his official capacity and under a sense of official duty for the protection of the interests of the People of the State of Illinois, and that no private interest had suggested or in any manner influenced him in instituting the proceedings.

P. J. LUCEY, Attorney General, and MACLAY HOYNE, State's Attorney, (GLENN E. PLUMB, and DONALD R. RICHBERG, of counsel,) for the People.

ISHAM, LINCOLN & BEALE, and HERRICK, ALLEN & MARTIN, (JOHN J. HERRICK, and GILBERT E. PORTER, of counsel,) for appellee.

Mr. JUSTICE CRAIG delivered the opinion of the court:

The sufficiency of the petition originally filed by the State's attorney to show probable cause for the institution of the proceedings, and of the counter-affidavits filed in support of the motion to vacate such order for the purpose of showing that such leave was improvidently granted, are

the only questions presented by the assignment of errors for decision by this court.

The statute of this State commonly known as the Quo Warranto statute (Hurd's Stat. 1913, p. 1921,) provides in section 1 that upon certain conditions therein named the Attorney General or the State's attorney of the proper county, either of his own accord or at the instance of any individual relator, may present a petition to any court of competent jurisdiction, or any judge thereof in vacation, for leave to file an information in the nature of *quo warranto* in the name of the People of the State of Illinois, and if such court or judge shall be satisfied that there is probable ground for the proceeding the court or judge may grant the petition and order the information to be filed and process to issue. This was the procedure followed in this case. A petition was presented, leave was granted to file the information, and the information was filed and process ordered issued. It is now insisted that no probable grounds were shown for so granting leave; that such leave was improvidently granted, and for that reason the order granting such leave was properly vacated and the proceedings abated upon the motion of respondent.

Where the preliminary proceedings on the hearing on the petition for leave to file the information are *ex parte,* the rule is well established in this State that whenever it is made to appear that leave to file such information has been inadvertently or improvidently granted or allowed under a misapprehension of the law or the facts, the court may, at any time during the term at which leave was granted, vacate and set aside the order granting such leave. (*People* v. *Union Consolidated Elevated Railway Co. supra; People* v. *Golden Rule,* 114 Ill. 34; *People* v. *People's Gas Light Co.* 205 id. 482; *People* v. *Darrough,* 266 id. 506.) And it is equally well settled that the discretion with which a court is vested in such matters is not a personal or arbitrary one but is a sound judicial discretion, resting upon

269 — 15

well established principles of law and subject to review. (*People* v. *Town of Thornton,* 186 Ill. 162; *People* v. *Mackey,* 255 id. 144.) With these settled principles in view, it is now the duty of this court to review the record of the lower court to ascertain, first, whether or not the petition showed probable ground for filing the information; and second, whether, after granting leave to file the information, the court abused its discretion in subsequently setting aside the previous order granting such leave.

At common law a writ of *quo warranto* was a writ of right for the crown and no leave was required for the Attorney General to file such information where only public rights were involved, but by section I of the Quo Warranto act of this State the common law rule has been abrogated, and now leave to file the information is required in all cases where the remedy is by an information in the nature of *quo warranto.* (*People* v. *Union Consolidated Elevated Railway Co. supra.*) Under our statute the application for leave to file the information is based upon a petition by the Attorney General or State's attorney of the proper county setting forth probable ground for the institution of the proceedings, but so far as we have been advised no case in this State has attempted to define or point out what will. constitute "probable ground" for the proceeding, as those words are used in the present statute. This is undoubtedly due to the fact that a decision of the question rests largely upon the facts and circumstances of each particular case. The statute only requires that "the judge shall be satisfied that there is probable ground for the proceeding" before granting leave to file the information and ordering process to issue. Webster, in his International Dictionary, defines the word "probable" as meaning "capable of being proved," and says that the words "probable cause," in law, mean "a reasonable ground of presumption that a charge is or may be well founded." We think it was in this sense that the words were used in the present

statute. When the words are taken in this broad sense it will be seen that the petition need do no more than set up a state of facts, apparently true, sufficient to induce a reasonable belief that rights, privileges, franchises or offices are being usurped, intruded upon or unlawfully exercised by a person or corporation in violation of law, to the detriment of the public in the manner alleged. When such a condition is set forth it may well be said that probable ground for the institution of the proceedings is shown and that leave was properly granted and process ordered issued.

Without re-stating the more essential allegations of the petition filed in this case, we think it sufficient to say that the petition presented by the State's attorney clearly set forth probable ground for the institution of the proceedings. It alleges with all the certainty that could reasonably be expected under the circumstances, a violation of section 13 of article 11 of the constitution and of section 21 of chapter 114 of the Revised Statutes of this State by the issuance and delivery by the Union Elevated Company of $5,000,000 in par value of its stock to the Loop Company without any consideration whatever, and by the issuance and delivery to the same corporation of $4,387,000 of its bonds for the construction of a railroad which did not cost more than $2,277,551 when fully constructed and equipped, and that these transactions were resorted to as a part of a fraudulent scheme or device to evade those constitutional and statutory provisions in making a dishonest and fictitious issue and increase of its capital stock and corporate indebtedness, and that after the transactions had been consummated the Union Elevated Company sold all of its property, rights, privileges and franchises to another corporation, and used substantially all of the purchase price of such property and franchises in redeeming at above par, or for $125 per share, ninety per cent of the stock previously issued to the Loop Company without any consideration whatever, and that this corpo-

ration has ever since that time, and for more than the last ten years, not exercised any of its corporate functions, powers, privileges or rights. Failure to exercise its corporate powers alone constituted sufficient ground to authorize the institution of the proceedings. As said in *Edgar Collegiate Institute* v. *People,* 142 Ill. 363: "The rule is, that it is a tacit condition of the grant to be a corporation that the grantees shall act up to the end or design for which they were incorporated, and that hence, through neglect or abuse of its franchise, a corporation may forfeit its charter as for condition broken or for a breach of trust. (Angell & Ames on Corp. sec. 774, and cases cited in note 1; High on Extraordinary Remedies, sec. 666.) And our statute provides that proceedings in the nature of *quo warranto* may be prosecuted against a corporation where it 'does or omits any act which amounts to a surrender or forfeiture of its rights and privileges as a corporation.' (Rev. Stat. 1874, sec. 1, chap. 112; 2 Starr & Curtiss, 1871.) It is true that 'where a misuser is relied upon as the foundation for proceedings to procure a forfeiture of the corporate franchise it must appear that there has been such a neglect or disregard of the corporate trust, or such a perversion of it to private purposes, as in some manner to lessen the utility of the corporation to those for whose benefit it was instituted or to work some public injury.'—High on Extraordinary Remedies, sec. 666."

If the allegations of the petition are true,—and they must be accepted as true for the purpose of determining the sufficiency of the petition,—we think it sets forth facts sufficient to show that there was reasonable ground for believing that the Union Elevated Company had neglected and abused its corporate rights, franchises and privileges, not only by making a fraudulent and fictitious issue of its capital stock and bonds and increasing its indebtedness with the intent of evading the constitution and laws of this State, but also by its failure to exercise and carry out

the objects and purposes for which it was chartered and created, and that the court did not err in granting leave to file the information.

As to the sufficiency of the showing that leave was improvidently granted, the counter-affidavits filed by respondent are in many respects merely contradictory of the allegations of the petition with respect to the consideration for which the stock of the Union Elevated Company to the amount of $5,000,000 and bonds to the amount of $4,387,-000 were issued and delivered to the Loop Company and of the fraudulent intent of evading the statute and constitutional provisions of the State. Counter-affidavits simply denying the allegations of the petition are not sufficient to show that the leave was improvidently granted. They merely show that an issue should be made up for trial. In *Attorney General* v. *Chicago and Evanston Railroad Co.* 112 Ill. 520, a petition for leave to file an information in the nature of *quo warranto* was filed and a rule was entered on the respondent to show cause why leave should not be granted to file the information prayed for. The respondent showed cause by its answer and motion to discharge said rule. As stated in the opinion in that case (p. 535): "If the facts relied upon by the respondent in answer to the rule to show cause were disputed or if new and doubtful questions of law were presented that would require more time for their satisfactory solution than could reasonably be given to them on such an application, then, under the authorities referred to by the relator, (Buller's Nisi Prius, 210, Angell & Ames on Corp. secs. 740, 741, and *King* v. *Meiss,* 3 T. R. 596,) it would doubtless be the duty of the court to make the rule for an information absolute, 'that the questions might receive a full and final determination.' But the relator concedes that the facts relied upon by the respondent in his answer to the rule to show cause are not disputed, and we are of opinion that the questions of law presented may receive as full and

careful consideration on this application as could be given them were the rule to show cause made absolute." The affidavit of A. L. Drum, the engineering expert, as to what should be taken into consideration in fixing the value of the respondent's properties and the value of the same was largely a matter of opinion and concerned matters on which hardly any two witnesses would agree.

The other matters set up in the affidavits filed on behalf of respondent tended to show the People were guilty of *laches* in instituting this proceeding, and for that reason the order granting leave was properly vacated. This was not made one of the points in the motion to vacate the order granting leave, nor would it have constituted good ground for so doing had such question been raised. The rule is fundamental in this State that the Statute of Limitations does not run against the State, and by analogy that *laches* cannot be imputed to it. The rule in this respect is stated by Mr. Justice Breese in *People* v. *Brown,* 67 Ill. 435, as follows: "It is a familiar doctrine that the State is not embraced within the Statute of Limitations unless specially named, and by analogy would not fall within the doctrine of estoppel. Its rights, revenues and property would be at fearful hazard should this doctrine be applicable to a State. A great and overshadowing public policy of preserving these rights, revenues and property from injury and loss by the negligence of public officers forbids the application of the doctrine. If it can be applied in this case, where a comparatively small amount is involved, it must be applied where millions are involved, thus threatening the very existence of the government. The doctrine is well settled that no *laches* can be imputed to the government, and by the same reasoning which excuses it from *laches,* and on the same grounds, it should not be affected by the negligence, or even willfulness, of any one of its officials." This doctrine was affirmed in *People* v. *Pullman Car Co.* 175 Ill. 125, where in the majority opinion it is

said: "We have examined the various cases cited by counsel for appellee as in support of the defense of waiver and acquiescence in the case at bar, and do not find that in any of them the defense has been deemed available, as against the sovereign or State, except in case where the right and title of a corporation to corporate existence was questioned because of some defect in the original charter, irregularity in the proceedings for the organization of the corporation, or its failure to perform or fulfill some condition precedent to its legal organization. * * * In the case at bar the appellee is conceded to be a corporation *de jure,* and the complaint is, it had assumed and exercised, and is assuming and exercising, powers not granted by its charter or implied by law." And to the same effect are the cases of *People* v. *Gary,* 196 Ill. 310, *People* v. *Burns,* 212 id. 227, *People* v. *Anderson,* 239 id. 266, *People* v. *Shedd,* 241 id. 155, *People* v. *Mackey, supra,* and *People* v. *Keigwin,* 256 Ill. 264.

To the above general rule, as pointed out by appellant, there are the three following exceptions, viz.: where there is a defect in the formal organization of a corporation, acquiesced in by the State; where the proceeding is for the benefit of a private relator; and where the legality of the organization of a municipality is questioned and injury to the public may result from assertion of the rights of the State. (*People* v. *Schnepp,* 179 Ill. 305; *People* v. *Rendleman,* 250 id. 289; *People* v. *Pullman Car Co. supra.*) The respondent is brought within neither exception by its counter-affidavits. In *People* v. *Golden Rule, supra,* it is said, on page 44 of the opinion: "We now hold that the court or judge may, under the present statute, act upon the petition of the relator without first laying a rule upon the respondents to show cause, and if satisfied that there are probable grounds for the filing of the petition, allow it to be filed. No hardship can result from this, when it is reflected that the summons, if ordered in vacation, must be

returnable on the first day of the next succeeding term; and if ordered in term time, it must be returnable on any day of the same term, not less than five days after the date of the writ, as shall be directed by the order of the court, (see Quo Warranto act, sec. 2,) and that the respondents, upon the return to the writ, may demur to the information and thus test its sufficiency, or, if it be sufficient, by plea set up any defense why judgment should not be pronounced upon it against the respondents. (See Quo Warranto act, sec. 4.) When the court had here allowed the information to be filed and ordered the summons to be issued, its discretionary powers were exhausted, and the issues of fact and of law presented by the pleadings must then have been tried and determined 'in accordance with the strict rules of law, in the same manner and with the same degree of strictness as in ordinary cases.' (High on Extraordinary Legal Remedies, latter part of sec. 606.) It is not denied that if the order to issue the summons had been made under a misapprehension of some fact material to be known by the court before making such order and but for which it would not have been made, it would have been competent for the court to vacate the order at any time during the term. But the court here acted upon no such mistake. It simply allowed that which should have been interposed as a defense on the final hearing to be urged as a ground for vacating the order." The opinion in *Golden Rule case* was by Mr. Chief Justice Scholfield, who also delivered the opinion of the court in *Attorney General* v. *Chicago and Evanston Railroad Co. supra,* and the two cases are important as showing the proper practice in cases like the one at bar. In *People* v. *Heidelberg Garden Co.* 233 Ill. 290, it is said: "It needs no citation of authorities to show that, except as where changed by statute, common law pleadings govern in this State in civil actions, and section 10 of the Practice act (Hurd's Stat. 1905, p. 1532,) shows clearly that it was intended therein

that the pleadings in matters of this kind should be in accordance with the common law. See, also, on this point, 17 Ency. of Pl. & Pr. 457; *People* v. *Healy,* 230 Ill. 280; *Bishop* v. *People,* 200 id. 33; *Hepler* v. *People,* 226 id. 275."

We think that according to the weight of authority the proper practice in the case at bar would have been to overrule the motion of the respondent to set aside the order granting leave to file the information and permit respondent to demur or plead to the information as it saw fit, so that the cause could be heard and determined according to the established rules of practice and as provided in the Quo Warranto statute.

It is further insisted by respondent in argument that the information filed is based upon matters not set up in the petition as grounds for the granting leave to file the information. Section 4 of the Quo Warranto act points out the manner in which defects or imperfections in an information may be taken advantage of, and until that method has been pursued and the sufficiency of the information passed upon by the lower court that question is not before us for review. We will therefore not pass upon it at this time.

For the reasons given, the judgment of the circuit court of Cook county will be reversed and the cause remanded, with directions to deny the motion to vacate the order granting leave to file the information and for further proceedings not inconsistent with the views herein expressed.                    *Reversed and remanded.*

NOTE.—The same order will be entered in *People* v. *Union Consolidated Elevated Railway Co.* (No. 9690,) submitted with this cause. .