## STATE V. LEATHERMAN ET AL.

1. QUO WARRANTO: *Jurisdiction of Supreme Court.*
   The Constitution of 1874, in giving to the Supreme Court power to issue the writ of *quo warraanto* to test the legality of municipal corporations, may be held, in view of the settled practice of the court, to have included informations for public purposes in the nature of the writ, as well as the writ itself, and prescribes the limits of the power and the proper parties to the suit.

2. MUNICIPAL CORPORATIONS: *Jurisdiction to create.*
   The act of April 28, 1873, conferring power upon Circuit Courts to annex territory to municipal corporations, did not empower those courts to create corporations.

3. SAME: *Long recognition by State cures illegal creation of.*
   The State may by long acquiescence and continued recognition of a municipal corporation, through her officers, State and county, be precluded from an information to deprive it of franchises long exercised in accordance with the general law.

*Information in the nature of the writ of Quo Warranto.*

*James P. Clarke*, for relator:

1.   It was competent under *Art 7, Sec.* —, *Const.* 1868, for the Legislature to impose on County Courts the duty of ascertaining the facts authorizing the assumption of corporate powers, &c.

10–38

At the time Arkansas City attempted to incorporate, the Circuit Court had been deprived of all jurisdiction, the act of 1868 having been repealed by act of April, 1869. *State* v. *Jennings*, 27 *Ark.*, 419.

2. The act of March, 1875, perpetuates only such towns as had an actual legal existence under former laws. Arkansas City never *existed* as an incorporated town. *Acts* 1874-5, *p. 2, sec. 5.*

3. In Arkansas there can be no such thing as a corporation existing by presumption. *Cooley Const. Lim. top p.* 239 ; 1 *Dillon on Mun. Corp., p.* 51, *sec.* 37, (17). In this case the attempt was *coram non judice*, and 15 *Mich.*, 470, and 16 *Ills.*, 257, cited for respondents, not applicable. In this connection see 45 *Ills. p.* 17, *et seq.* The provisions of Constitution 1868 and 1874 are exclusive of all others. *Const.* 1868, *Art* 5, *sec.* 49, and corporate powers can only be exercised in the manner provided.

*C. B. Moore*, Attorney General, for relator.

*Martin & Martin* and *L. A. Pindall*, for respondents.

Under Constitution of 1868, municipal corporations were originally organized under *general laws. Sec. 50, Art 5, Const.* 1868. *Sections* 3202, 3255 to 3258, *Gantt's Dig.* All necessary facts existed in this case, and all courts take judical notice of the corporation. *Gantt's Dig.*, *sec.* 3,258. The Constitution prescribed no particular forum. The act of 1868 prescribed the Circuit, the act of 1869 the County Court. The latter abolished in April, 1873, and by act of April 28, 1873, vested jurisdiction in the Circuit Court. See *sec,* 3318 *Gantt's Dig.* Purely a ministerial act, not clearly defined, nor after a lapse of time and ac-

-crual of rights, material. The *5th sec.*, *act* 1875, cured any
·defects. *Secs.* 3198, 3199, 3200, .3201, *Gantt's Dig.*;
.*Secs.* 3, 4 and 5, *act March* 9, 1875.

After a length of time courts will not disturb the organ-
-tion of towns. *Jamison* v. *People*, 16 *Ill.*, 256; *People* v.
*Mainard*, 15 *Mich.*, 471; *U. S.* v. *Dandridge*, 12 *Wheat*,
·64; *R. R. Co.* v. *Creegor*, 5 *Har. & John.*, 125; *Mid-*
·*dlesex* v. *Davis*, 3 *Metcalf*, *Mass.*, 137; *Dunning* v. *N. A.
& S. R. R.*, 2 *Carter*, *Ill.*, 438.

The Constitution of 1874 does not vest power to create
·corporations in County Courts, and the Legislature cannot
give them additional *judicial* powers; and unless the act of
1875 confers *ministerial* powers on County Courts it is un-
·constitutional, and Circuit Courts which exercise the
:residuum of *all judicial* power are the proper tribunals.

Enquiry is now barred by limitation. *High's Ext. Legal
.Rem.*, *par.* 692; *Knight* v. *Heaton*, 22 *Vt.*, 481; *Secs.*
4129, 5677, *Gantt's Dig.*

EAKIN, J. This case invokes the original jurisdiction of
·this court, in one of the cases provided for, by the 5th sec-
tion of Art. VII of the Constitution. It is an applica-
·tion by the Attorney General in the nature of an
information on behalf of the State, against the Mayor,
Aldermen and Recorder of the town of "Arkansas City"
·to test the legal existence of the corporation; substantially
it is an applicatian for a writ of quo warranto. Notwith-
·standing some earlier decisions to the contrary, it had long
before the adoption of the Constitution of 1874, been the
·practice of this court to disregard the distinction between
·the old writ of quo warranto, and the information in the
nature of it; and the Constitution in giving this court
power to issue the writ of quo warranto to test the legal
·existence of municipal corporations, may be held, in view

1. QUO
WARRAN-
TO:
Jurisdic-
tion of Su-
preme
Court.

State v. Leatherman et al.

of the settled practice, to mean and include informations for public purposes in the nature of the writ, as well as the old writ itself.

*Limits of jurisdiction and proper parties prescribed* The language of our Constitution relieves us of the necessity of deciding a point of practice which has been elsewhere a matter of some embarrassment; that is, whether the suit should be against the corporation itself, *eo nomine*, or may be against its officers. It is that this court may issue the writ to officers of political corporations, "when the question involved is the legal existence of such corporations," thus not only giving the jurisdiction, but prescribing its limits, and the proper parties.

The cause is submitted on demurrer to the answer. The only question presented by the pleadings is, whether the town of "Arkansas City" can be recognized as an existing municipal corporation. The material facts disclosed by the admissions of the answer are : that an attempt was made to organize the town as a corporation, upon application to the Circuit Court of Chicot County, and by virtue of an order thereof, made on the twelfth day of September, 1873. It is conceded, save as to the tribunal, that the organization was effected, substantially, in accordance with the general incorporation act then in force. It further appears that from that time until the commencement of this suit the town had continuously exercised the powers and franchises of a corporation ; electing officers of whom the mayors successively elected had been commissioned by the Governor, and the others had been duly qualified ; passing and enforcing ordinances, collecting fines, making public improvements, entering into contracts for the public benefit ; levying taxes which, from time to time, had been regularly extended on the tax books, and placed in the hands of the County Collector, and that for delinquencies in payment of such taxes, lands had been sold and titles become involved.

Other matters of like nature tending to show the inconvenience and embarrassment of now holding the corporation void *ab initio* are urged; and it is also shown that the territory of the town is upon the Mississippi river and the common terminus of two railroads from the interior ; that it has a population of from one to two thousand inhabitants, that many strangers are continually passing and that it requires a local police for the protection of property, and the security of the peace. Further that the ground had been platted into blocks, lots, streets, alleys, parks, &c., which plat had been recorded and sales and transfers had been made with reference thereto.

It will be seen that two points only are presented : 1st. Was the corporation organized in accordance with law so as to acquire thereby a valid existence ; and, 2nd, if not, has the acquiescence of the State for so long a period so affected her right to now question the franchise as to leave it within the power of this Court in the exercise of a sound discretion to refuse a relief fraught with consequences so disastrous to the long line of officers, and list of contractors and purchasers of property, who have been acting *bona fide* in obedience to and accordance with what they supposed to be a legitimate governing body. It goes without saying, that if this Court can find such discretion, it will, under the circumstances disclosed, exercise it to cure what has been done, and maintain the existing order of things. Whilst a moral wrong can never rest harmless, a mere mistake may become so insisted in healthful surroundings, and embedded under supervening rights, as to make its extraction as dangerous as useless.

Upon the first point it is obvious that the Circuit Court and the petitioners in the proceedings for organization, mistook the tribunal. The power had been conferred upon the Circuit Court by the general incorporation act of 1868 ;

but this act had been superseded by another covering the
same ground passed April 9th, 1869. The latter act had
not been published in the regular pamphlet acts of the ses--
sion, but in a separate one commonly known to the profes-
sion in our State as *McClure's Digest*, which contained a
collection of acts supposed to have been adopted by the
Legislature, as a part of the general revision of the whole
statutory law of the State. The greater part of them, how-
ever, though not all, were held invalid by the Courts ( *Vin--
sant admx*. v. *Knox*, 27 *Ark*., 266). Amongst those sus--
tained was the said act of 1869, vesting in the County
Courts the jurisdiction to determine and pronounce upon the
creation of municipal corporations. At that time by the
constitution then in force, the powers which the Legislature
might vest in County Courts were not strictly limited, and
the right to confer upon them this power cannot be seriously
questioned.

2. MUNIC-       On the third of April, 1873, County Courts were abolished,.
IPAL COR-
PORATIONS and Boards of County Supervisors appointed in their stead ;.
Jurisdic-
tion to to which were transferred all the powers and duties of the
create.
County Courts. It is noticeable, however, that the Legis-
lature, afterwards, on the twenty-eighth of April, 1873,.
seems to have overlooked the former transfer of jurisdiction
from the Circuit Courts, or at least to have still considered.
it a very appropriate tribunal for kindred subjects. By act:
of that date, making provision for the annexation of territory
to corporations, it was provided that application for the
purpose should be made to the Circuit Courts. It is rather
suggested to the Court, than contended, that this was a
recognition of a remaining jurisdiction there, over the sub--
ject matter ; which would still authorize those courts to re-
ceive and act upon applications for the *creation* of new cor-
porations. We cannot so extend the language of the act,.
which regards annexations only. It seems anomalous, and

was, perhaps, passed under the mistaken impression that the act of 1868 was still in force; but we cannot, on that account, hold the act of April 9th as having been suspended.

So the law stood when the order of the Circuit Court was made, establishing Arkansas City. There was no jurisdiction and the order was void. I find nothing to cure this in the Constitution of 1874, nor in subsequent legislation. The new general incorporation act of March 9th, 1875, sec. 5, adopted only such corporations as were existing at the time the new Constitution took effect, and which had been "described or denominated" by some law then in force. This had not been.

But it had been an existing *de facto* corporation all the time from 1873 till now; and many things had in good faith been done under it which it would be shocking now to undo. The disastrous consequences would not be confined to the case of Arkansas City. Municipal corporations throughout the State have become numerous. They are not only highly beneficial, but necessary agencies of good government. We can see how many of them may have been heretofore, or may be henceforth, put in operation under the same, or similar mistakes. To declare them all null, after long acquiescence on the part of the State would open a very Pandora's box of litigation, and produce incalculable hardship and confusion.

This impels us to the broader field of enquiry, whether this court, in view of justice, equity, and the security of titles, can find, in recognized principles of law, sufficient warrant for refusing its aid in opening the flood-gates of such unmitigable evil.

The practice of filing informations in the nature of a quo warranto existed at common law. But it was always on the relation of the Attorney General, to vindicate or protect the rights of the crown against usurpation and abuse of its

franchises.   Never upon the relation of a private person to
try his  right  to an office, until the statute of Anne, which
made this  proceeding subservient  to the  trial  of  private
rights of this nature, and  allowed informations  by the At-
torney General   on   the   relation of individual citizens, for
their benefit.   The statute was never in force in this State.
We have other  appropriate proceedings to  determine, be-
tween individuals, the right to  hold office.   The course of
judicial decisions under the  act  in  England, are however
worthy of note, being pregnant examples of their tendency
to prevent the abuse of the proceedings, after long  ac-
quiescence on  the  part of  those assuming to have been
aggrieved.

Originally, upon the passage of  the act, the granting of
these informations was  matter  of  course ; and when once
filed, by leave, the courts felt bound to determine the right
by strict law regardless of consequences.   This afterwards
ceased to be the practice  in  case of  private relators.   The
granting of leave was made to  depend on the sound discre-
tion of the  court, which  it  came  to  exercise upon the par-
ticular circumstances of  each case.   Although, at common
law, the time in which the right to exercise an  office might
be impeached, was indefinite, the  person against whom the
remedy, under the act of  Anne, was  sought, might show
that his  right had been acquiesced in for a  long time.   By
analogy to the statute of limitations the  time was  at first
fixed at twenty years.   Afterwards  it was  reduced to six.
See cases collected and cited in *Bacon's Abridgement  Title
"Informations"* (*D*).   See also *High on Extraordinary
Remedies Title "Quo Warranto"* (*passim*).   I do not
find, however, that  any English cases  go to the  extent of
holding that this applies  to  other cases  than those of pri-
vate relators  seeking personal rights ; or that the doctrine
of *"nullum  tempus  occurrit  regi"* has  ever  been there

ignored in case of such applications, in behalf of the sovereign, as the Attorney General might have made before the act of Anne. The discretion of the court, indeed, although not used at first, is based upon the language of the act, which expressly provides that the relations therein allowed must be filed by leave of court.

But times change, and the exigencies of society and good government change with them. The great multitude of new municipal corporations continually springing up in the American states, their convenience, and indeed absolute necessity, as agencies of government, and the danger of the impending evils to which I have alluded, have induced several American courts and distinguished jurists to go a step further, and apply this discretion to proceedings on the part of the State herself, without any private relator. The step seems to have been impelled *ex necessitate rei*, and in truth implies sounder views, and advanced ideas of the nature of sovereignty, as resting in the State for the public good, and not for the distraction of business, and confusion of rights.

The case of *Jameson* v. *The People*, 16 *Illinois*, *p.* 257, was a *quo warranto* to test the validity of a municipal corporation, which had not been organized in accordance with aw. The corporation had gone into operation and had been named in a subsequent legislative act, giving it certain powers. This was held to have cured the irregularity, but the opinion of the court goes upon still broader grounds. SKINNER, J., said: "If there is no such corporation, all acts done under the supposed corporate powers, are mere nullities, and no liabilities can exist by reason of contracts made in the corporate name. * * * * Were we to hold, after this acquiescence of the public, and these recognitions of the Legislature, that the town remains unincorporated, on account of some defect in its original organiza-

11–38

tion as a corporation, what confidence could individuals have
in the validity of securities emanating from these local au-
thorities? Municipal corporations are created for the pub-
lic good—are demanded by the wants of the community ;
and the law, after long continued use of corporate powers,
and the public acquiescence, will indulge in presumptions in
favor of their legal existence.'' It is true that the defect
of organization in that case was only the result of an irreg-
ularity, and there had been an express legislative reorgani-
zation. But the grounds upon which the court proceeds
extend much beyond the facts of the particular case.

The case of *The People* v. *Maynard*, 15 *Michigan*, 470,
was an information in the name of the attorney general, by
a private relator, against the treasurer of a county. The
issue involved the legal existence of a county. The case,
as to facts, is not in point, as an authority ; but in the course
of the opinion I find these broad grounds again asserted :
''In public affairs, where the people have organized them-
selves, under color of law, into the ordinary municipal
bodies, and have gone on, year after year, raising taxes,
making improvements, and exercising their usual franchises,
their rights are properly regarded as depending quite as
much on the acquiescence, as on the regularity of their ori-
gin, and no *ex post facto* enquiry can be permitted to undo
their corporate existence. Whatever may be the rights of
individuals before such general acquiescence, the *corporate
standing* of the community can be no longer open to ques-
tion.''

There is a case in the early reports of Alabama, *State,
etc.*, v. *Burnett*, 2 *Ala.*, *N. S.*, *p.* 140, in which the judge,
in arguing, recognizes the discretion of the court to refuse
an information at the instance of one who had no claim to the
office, and also when the franchise involved no qestion of
private rights ''as in the cases of corporations, either public

or private." The distinction drawn in that case, however, seems to us novel, inasmuch as it denies the discretion where the information is in behalf of a private right.

The opinions above quoted taken altogether, although none are exactly in point, seem to us utterances of an enlightened and progressive jurisprudence, widening and adapting itself to free American institutions, and the rapid developments of the country in the growth of towns and cities.

We are emboldened by them to declare in behalf of the public good, that the State herself may, by long acquiescence, and by the continued recognition through her own officers. State and county, of a municipal corporation, be precluded from an information to deprive it of franchises long exercised in accordance with the general law.

3. MUNIC-IPAL COR-PORATIONS. Long acquiescence by State cures illegality of its creation.

The case made by the answer shows an acquiescence for nearly nine years, and a recognition by the Governor, county court, county clerk, county collector, and the whole of a population now over one thousand. If the answer be true, the corporation of Arkansas City should not *now* be held null and void.

Overrule the demurrer.