ATTORNEY GENERAL *vs.* CITY OF METHUEN.

Essex.    September 17, 1920. — January 4, 1921.

Present: RUGG, C. J., DE COURCY, CROSBY, CARROLL, & JENNEY, JJ.

*Quo Warranto.    Attorney General.    Municipal Corporations,* Validity of charter. *Constitutional Law,* Incorporation of town as city.    *General Court.    Jurisdiction.    Practice, Civil,* Parties.

An information in the nature of a quo warranto may be brought by the Attorney General in behalf of the Commonwealth to test the question whether the franchises and prerogatives of a municipal corporation have been usurped.

In a proceeding of the character above described in which it is alleged that a statute incorporating a town as a city was invalid because contrary to art. 2 of the Amendments to the Constitution, the municipality nominally and in fact exercising the franchises and prerogatives alleged to have been usurped may be made the party defendant.

The General Court under art. 2 of the Amendments to the Constitution has no jurisdiction to constitute a city government in a town unless and until its action to that end is sought by the inhabitants of the town who have signified their consent to such application being made by vote at a meeting of the town called under a written warrant, setting out in fairly intelligible language the subject or subjects to be acted upon by the voters and signed by the selectmen or, in the event of their unreasonable refusal to sign, by a justice of the peace, and served by the constable or other designated person.

Subsequent approval or ratification by a town, at a meeting "duly warned and holden," of action of the General Court purporting to constitute it a city without the making of the precedent application in accordance with the request or consent of the voters required by art. 2 of the Amendments to the Constitution, will not validate such action.

At an annual town meeting of the inhabitants of Methuen, the warrant for which contained no notice that the subject of a change in the form of town government would be considered, a committee was appointed to investigate the advisability

of changing the town's form of government. At the next annual meeting, under an article in the warrant, "to hear reports of committees and to act thereon," that committee reported, recommending that an application be made to the Legislature for a limited town meeting form of government. Such an application was made and Spec. St. 1916, c. 116, was enacted and was duly accepted by the town. *Held*, that, in such proceedings the requirements of art. 2 of the Amendments to the Constitution were not fulfilled, so that a contention to the effect that the form of town government was so changed that a further change by the enactment of Spec. St. 1917, c. 289, without observance of the requirements of art. 2 of the Amendments to the Constitution, was valid, had no relevancy.

A vote of a public meeting in the town hall of Methuen, called by a published notice signed by the chairman and the clerk of the joint committee on cities of the Legislature and addressed to persons interested in a bill then pending to institute a city government in the town, which was favorable to the enactment of the bill, was not an application for such action to the General Court by a majority of the inhabitants of the town present and voting "at a meeting duly warned and holden for that purpose" as required by art. 2 of the Amendments to the Constitution, it not appearing that the meeting was called as a town meeting, that any town officer functioned at the meeting, that a check list of voters was used or that records were kept by the town clerk.

While the principles, that no laches can be imputed to the government and against it no time runs so as to bar its rights, and that estoppel does not apply ordinarily against the exercise of a public right, the interests of the Commonwealth usually being held *not* to be prejudiced by the failure of public officers to do their duty, apply to quo warranto proceedings instituted by the Attorney General on behalf of the Commonwealth, the granting of relief in such proceedings, even when sought at the instance of the Attorney General in behalf of the public, is not a matter of absolute right but is a subject for the exercise of sound judicial discretion.

In an information in the nature of a quo warranto, it was alleged that the proceeding was brought by the Attorney General "in behalf of the Commonwealth and at the relation of" an individual citizen and the prayer was in the form, "Wherefore, the Attorney General upon relation of" the citizen "as aforesaid, prays . . ." The informant's brief before this court was signed by the Attorney General and by one of his assistants and also by counsel for the relator. The only oral argument in behalf of the informant in this court was made by counsel for the relator. *Held*, that

(1) The permission given to the counsel for the relator to argue in support of the Attorney General's information must not be taken as a precedent;

(2) The validity of a city charter cannot be assailed in this form of proceeding by one who has only the standing of a private citizen;

(3) An information of this nature must be presented by and on behalf of the Commonwealth and by and under the immediate supervision of the Attorney General, and in that way alone;

(4) If the name of the relator be rejected as surplusage, enough remained in the record to show that the information was filed by the Attorney General in behalf of the Commonwealth.

Where, more than three years and two months after the approval by the Governor of Spec. St. 1917, c. 289, purporting to constitute a city government in the town of Methuen, and more than two years and five months after the inauguration of a city government upon the supposed authority of the statute, the Attorney

General, whose attention then for the first time was called to the matter by a private citizen of Methuen, filed an information in the nature of a quo warranto based upon allegations that the statute was invalid because the requirements of art. 2 of the Amendments to the Constitution were not observed, this court, while determining that the statute was invalid, *held* that, in the circumstances, granting the relief sought would not be a discreet exercise of judicial power nor in conformity to the general public interest.

INFORMATION in the nature of a quo warranto, brought by the Attorney General "in behalf of the Commonwealth and at the relation of Charles W. Mann" and filed in the Supreme Judicial Court for the county of Essex on July 8, 1920, against the "City of Methuen," praying for "the advice of this court in the premises and for proper process to be issued to command the said municipal corporation of Methuen to answer by what warrant it claims to have, use and enjoy the corporate powers, privileges and franchises aforesaid, and for such other relief in the premises as justice may require."

The facts were agreed upon and were substantially as follows:

Previous to the enactment of Spec. St. 1916, c. 116, Methuen was a town. That statute provided for precinct voting and a limited town meeting in the town and became effectual upon its acceptance by the town at a special election on July 29, 1916. In 1915, Methuen by the State census had more than fifteen thousand inhabitants and at all times since has had more than twelve thousand inhabitants.

On January 29, 1917, William L. Stedman, Samuel Rushton and David D. Woodbury, who then constituted the board of selectmen of Methuen, filed with the General Court a petition, signed by them under the title "Board of Selectmen" and reading: "The undersigned, citizens of Massachusetts, respectively petition for the incorporation of the town of Methuen as a city under such charter or plan of government as the voters of said town may by their votes prefer." No town meeting was ever "duly warned and holden" previous to such application for the purpose of voting thereon and no inhabitants of the town held any meeting in the town, called or warned in accordance with the provisions of St. 1913, c. 835, Part V, § 394, and amendments thereto for the purpose of considering the question of applying for a city charter for the town, and no meeting of the inhabitants of the town was ever called or warned in accordance with the by-laws or a vote of

the town to consider questions of making application for a city charter for the town, and no vote was ever passed at any town meeting in the town authorizing any person or persons to apply for a city charter for the town, and the town of Methuen took no action in any manner or form at any town meeting duly warned by an article in the warrant relative to a city charter, "unless and except the following can be construed as a compliance with the provisions of the second amendment to the Constitution:"

On March 21, 1914, at a regular town meeting of the qualified inhabitants of the town of Methuen, a vote was passed providing for the appointment of a committee of nine qualified inhabitants of the town to investigate the advisability of changing the then existing form of town government of the town, and that such committee report their recommendations to a future meeting. At this meeting the warrant contained no article warning the inhabitants of any proposed change in the form of the town government or of the proposed appointment of the committee. The committee was appointed and acted in accordance with its instructions and submitted its report at the next annual town meeting held on March 6, 1915, under the article in the town warrant, "To hear reports of committees and to act thereon," and recommended an application to the Legislature for the limited town meeting form of government, so called. Spec. St. 1916, c. 116, was passed by the Legislature, was approved by the Governor on February 24, 1916, and was accepted by the voters at a special election on July 29, 1916. On March 1, 1917, a hearing was held by the joint Legislative Committee on Cities in the town hall of Methuen, notice of the hearing having been duly advertised in newspapers announcing that the committee would give a hearing to parties interested in a Senate bill providing for a charter for Methuen, the notice being signed by the chairman and the clerk of the committee. That hearing was largely attended by the inhabitants of the town of Methuen, but the number present is unknown. A vote was taken at that hearing at which every person present, except one, voted in favor of changing from town form of government to the city form of government. The hearing was not presided over by the moderator of the town of Methuen, no check list of legal voters was used in connection with the aforesaid votes, no records of the hearing were kept by the town clerk of the town, who did not

function at the hearing, and the number of voters present and voting thereon is unknown. Thereafter the committee reported to the Senate a bill which eventually was passed and, having been approved by the Governor, became Spec. St. 1917, c. 289. It was submitted to the legal voters of Methuen at the annual State election of the year 1917, when it was accepted, nine hundred and twelve voting in favor of and four hundred and fifty voting against acceptance, there also being two hundred and ten blank ballots. In December, 1917, an election was held at which a mayor and a board of aldermen were elected and on the first Monday in January, 1918, there was organized and inducted into office a full set of officers called for by the provisions of the charter and from that day until the date of this information the respondent city has conducted its affairs under and in accordance with the provisions of that charter, and no town officers have functioned.

The relator, Charles W. Mann, was present and took part in the hearing called by the Legislative committee and there stated "that the town ought to have the right of voting whether it wanted a charter or not." Since the alleged adoption of the charter he at one time has been nominated as a candidate for the city council, but at that time he did not have knowledge of any defect, constitutional or otherwise, in the alleged city charter, and as soon as he knew of the alleged defects he objected to the validity of the charter by disclosing to the Attorney General the defects set forth in the information.

The case was reserved by *Braley,* J., for determination by this court upon the pleadings and the agreed statement of facts.

*F. W. Morrison,* (*A. E. Seagrave,* Assistant Attorney General with him,) for the relator.

*J. P. Kane,* (*C. A. Clifford* with him,) for the respondent.

RUGG, C. J. This is an information in the nature of a quo warranto brought by the Attorney General "in behalf of the Commonwealth and at the relation of Charles W. Mann" against the city of Methuen seeking to have the city charter of Methuen declared void as having been enacted contrary to the requirements of art. 2 of the Amendments to the Constitution, and to have a judgment of ouster accordingly.

The question whether the Attorney General has power by virtue of his office to bring an information in the nature of a

quo warranto to test the validity of a city charter never before has arisen in this Commonwealth. It is a question which would be likely to arise infrequently. There seems to be no sound reason why the Attorney General should not have the same right to institute proceedings respecting the usurpation of the franchises and prerogatives of a municipality or other governmental subdivision as he possesses respecting like acts of a private or *quasi* public corporation. The evil is likely to be quite as great in one case as in the other. The public interest in its suppression is as acute in the one instance as in the other. That proceedings of this nature be instituted by an officer of the State acting under the responsibility of his oath and with the impartiality naturally flowing from his position rather than through the heat of partizanship or the ungenerous impulses of personal antagonism' apart from a personal right or interest, is as desirable in the one case as in the other. That the Attorney General has such power follows from the discussion in *Attorney General* v. *New York, New Haven, & Hartford Railroad,* 197 Mass. 194. See also *Attorney General* v. *Suffolk County Apportionment Commissioners,* 224 Mass. 598, 610, 611.

An information in the nature of a quo warranto may be brought by the Attorney General in behalf of the Commonwealth to test the question whether the franchises and prerogatives of a municipal corporation have been usurped. The municipality nominally and in fact exercising such franchises and prerogatives may be made the party defendant. That proposition rests upon sound principle. It is supported by the great weight of adjudications in other jurisdictions. *State* v. *Bradford,* 32 Vt. 50. *Nelson* v. *Consolidated Independent School District of Troy Mills,* 181 Iowa, 424. *People* v. *Kingsland,* 70 N. Y. 518. *People* v. *Powell,* 274 Ill. 222, 227. *Evens* v. *Anderson,* 132 Minn. 59, 62. *Earlboro* v. *Howard,* 47 Okla. 455. *State* v. *Birmingham,* 160 Ala. 196. *State* v. *Clark,* 75 Neb. 620. *Brennan* v. *Bradshaw,* 53 Texas, 330. *State* v. *Osburn,* 24 Nev. 187. *Dakota* v. *Armstrong,* 6 Dak. 226. *Askew* v. *Manning,* 38 U. C. (Q. B.) 345, 361. *State* v. *Commissioners of Ford County,* 12 Kans. 441. *Henry* v. *Steele,* 28 Ark. 455. *Bateman* v. *Florida Commercial Co.* 26 Fla. 423. *Velasquez* v. *Zimmerman,* 30 Col. 355. *State* v. *Atlantic Highlands,* 20 Vroom, 457. *State* v. *Woods,* 233 Mo. 357. *State* v. *Leischer,* 117 Wis. 475. *Rex* v. *Corporation of*

*Carmarthen,* 2 Burr. 869. *The King* v. *Ogden,* 10 B. & C. 230. There is nothing in *Attorney General* v. *Sullivan,* 163 Mass. 446, at variance with this conclusion. See *Attorney General* v. *Salem,* 103 Mass. 138.

It becomes unnecessary to consider whether the circumstances are such that the relator would be barred of relief for any reason. Manifestly there is nothing on this record which prevents the Attorney General from asking the court to consider his contentions. *Commonwealth* v. *Allen,* 128 Mass. 308.

The constitutionality of Spec. St. 1917, c. 289, is assailed. The ground upon which that contention rests is that that statute was not enacted as required by the Constitution and hence that the exercise of the franchises of a city by the defendant is a usurpation. That statute in form provides that the inhabitants of the town of Methuen shall continue and become a body corporate and politic under the name of the city of Methuen, enjoying all the rights and powers and subject to all the duties and obligations of cities as municipal corporations. That act was submitted to the legal voters of the town "for their acceptance or rejection," and was "accepted" by them by ballot as provided by § 54 of c. 289. Officers of the city were elected in December, 1917, and assumed the control of the municipal affairs of Methuen on the first Monday of January, 1918. Since that time its government has been in accordance with c. 289.

The only authority conferred by the Constitution to establish a city is found in art. 2 of the Amendments. It is in these words: "The General Court shall have full power and authority to erect and constitute municipal or city governments, in any corporate town or towns in this Commonwealth, and to grant to the inhabitants thereof such powers, privileges, and immunities, not repugnant to the Constitution, as the General Court shall deem necessary or expedient for the regulation and government thereof, and to prescribe the manner of calling and holding public meetings of the inhabitants, in wards or otherwise, for the election of officers under the Constitution, and the manner of returning the votes given at such meetings. Provided, that no such government shall be erected or constituted in any town not containing twelve thousand inhabitants, nor unless it be with the consent, and on the application of a majority of the inhabitants of such town,

present and voting thereon, pursuant to a vote at a meeting duly warned and holden for that purpose. And provided, also, that all by-laws, made by such municipal or city government, shall be subject, at all times, to be annulled by the General Court." The precise points urged against the validity of the statute are (1) that there was no application for the enactment of a statute constituting the town of Methuen to be a city by a majority of the inhabitants of that town present and voting thereon pursuant to a vote at a meeting duly warned and holden for that purpose: and (2) hence that Spec. St. 1917, c. 289, is void as a city charter.

These exact points have not hitherto been presented for determination. Their decision depends upon the meaning of art. 2 of the Amendments to the Constitution. That article was proposed and adopted because the Constitution as it stood theretofore required a town form of government "not adapted to the condition of a populous town," and because it was deemed necessary "to authorize such an organization as is adapted to the condition of a numerous people." Remarks of Lemuel Shaw, Journal of Mass. Convention, 1820–1821, page 98.

There are few decisions respecting art. 2 of the Amendments to the Constitution. It was said by Chief Justice Gray in *Hill* v. *Boston*, 122 Mass. 344, at page 357: "The Constitution does not indeed allow a city to be established in the first instance, so as to transfer the immediate control of local affairs from the whole body of citizens in town meeting to a delegated city council, except with the consent and on the application of a majority of the inhabitants." *Warren* v. *Mayor & Aldermen of Charlestown*, 2 Gray, 84, 101. In *Larcom* v. *Olin*, 160 Mass. 102, St. 1892, c. 377, which established a model form of city charter and provided for its adoption by vote of a town possessing other constitutional requisites for becoming a city without further action by the General Court, was held to be contrary to the terms of art. 2 of the Amendments. In the course of the opinion, written by Chief Justice Field, it was said, at page 108: "The proviso was inserted in the proposed amendment that the voters in small towns might continue to hold their ancient privileges of managing their own town affairs. The limit was fixed at twelve thousand inhabitants, and it was also provided that, although the town contained twelve thousand inhabitants, the General Court should not constitute it a

city government except 'with the consent and on the application of a majority of the inhabitants,' etc. The practical construction put upon the proviso has been that the town must first make an application to the General Court by a vote of its inhabitants, and, if an act of incorporation is passed pursuant to the application, that the act must be submitted for acceptance to the inhabitants. Whether two meetings and two votes are necessary or not, certainly there must be an application and a consent manifested by a vote pursuant to the proviso. The General Court cannot constitute a small town a city in any manner, and it can constitute a town containing twelve thousand inhabitants or more a city only upon its own application, and the General Court is not required to constitute such a town a city if it makes the application, but is only authorized to do so if it sees fit." The substance of that decision was stated in *Cunningham* v. *Mayor of Cambridge*, 222 Mass. 574, at page 576, in these words: "In brief, the ground was that art. 2 of the Amendments to the Constitution plainly contemplated that the question, whether any municipality should make the initial change from a town to a city form of government, must be decided in each instance as it arose upon petition by the majority of the inhabitants of the town, by the General Court itself, and the particular terms of each city charter which marked that transformation should receive the careful attention of the legislative department of government. This intent of the people in adopting the Second Amendment to the Constitution doubtless had its foundation in deep-seated regard for the town meeting form of government and a thorough appreciation of the significance of discarding it for administration of local affairs through the city form of government."

The plain implication if not the express words of the opinion in *Larcom* v. *Olin* and the natural inference from the other decisions is that the Second Amendment requires that the first step toward a change from the town to the city form of government must be an application presented to the General Court in consequence of a preceding vote adopted by a majority of the inhabitants of the town present and voting in a meeting warned and held for that purpose.

Fair interpretation of the meaning of the amendment as disclosed both by its words and its history leads irresistibly to the

same conclusion. An amendment to the Constitution is one of the most solemn and important of instruments. It commonly is a brief and comprehensive statement of a general principle of government. It ordinarily is not long, complicated nor detailed and does not descend to the minute particulars appropriate to a statute. Its phrases are chosen to express generic ideas, and not nice shades of distinction. Its words should be interpreted in "a sense most obvious to the common understanding at the time of its adoption," because it is proposed for public adoption and must be understood by all entitled to vote. *Bishop* v. *State*, 149 Ind. 223, 230. *State* v. *Butler*, 70 Fla. 102, 133. Mr. Justice Holmes in *Eisner* v. *Macomber*, 252 U. S. 189, at page 220. *Tax Commissioner* v. *Putnam*, 227 Mass. 522, 523, 524.

The first sentence of the Second Amendment, standing by itself alone, is a clear, unqualified, explicit grant of power to the General Court "to erect and constitute municipal or city governments." If that sentence stood alone there could be no doubt of the authority of the General Court even to impose a city form of municipal government upon the inhabitants of a town against their protest. But that sentence does not stand alone. It is followed by another sentence, the first word of which is, "Provided." That word in common speech naturally expresses a qualification, a limitation, a condition, or an exception respecting the scope and operation of words previously used. Although a proviso in statutes, contracts or wills not infrequently introduces new or independent matter, its true office and its general purpose is to restrict the sense or make clear the meaning of that which has gone before. *American Express Co.* v. *United States*, 212 U. S. 522, 534. *Georgia Railroad & Banking Co.* v. *Smith*, 128 U. S. 174, 181. *Brennan* v. *Brennan*, 185 Mass. 560. *Considine* v. *Metropolitan Life Ins. Co.* 165 Mass. 462, 464, 465. The substance of the second sentence of the amendment shows unequivocally that its introductory word "Provided" is used in its natural sense and true office. Its words are those of condition and qualification. They express clear and definite limitation in at least two particulars upon the amplitude of power described in the preceding sentence. The first limitation defines the minimum number of inhabitants which a town must contain before the power of the Legislature can become operative. The second limitation is that no city government shall

be erected or constituted "unless it be with the consent, and on the application of a majority of the inhabitants of such town." Those words convey the unmistakable meaning that the power of the General Court cannot be put forth to the incorporation of a city unless its action to that end first is sought by inhabitants of the town. "Application" in this connection can have no other rational significance than an appeal, a request, a petition. "Application" cannot with any due regard to the approved usages of the language be construed in the sense of ratification or subsequent approval. The second sentence of the amendment goes further and points out the way in which the "consent" and "application" of the town must be manifested. Such "consent" and "application" must be ascertained and declared by a vote of a majority of the inhabitants "present and voting thereon . . . at a meeting duly warned and holden for that purpose." All the inhabitants of the Commonwealth in 1821, when the Second Amendment to the Constitution was approved by the people, were familiar with the method of calling and conducting a town meeting, because there were no cities and everybody lived under the town form of government, except the few dwelling on common lands or in unincorporated communities. To such persons these words of the amendment could convey but one idea, namely, a meeting called under a written warrant setting out in fairly intelligible language the subjects to be acted upon by the voters, signed by the selectmen or, in the event of their unreasonable refusal, by a justice of the peace of the county, and served by the constable or other designated person. St. 1785, c. 75, § 5. Such a warrant is of the essence of the town meeting. It is necessary in order that the people may know in advance the subjects upon which they may be required to act.

The concluding sentence of the Second Amendment has no relevancy to the questions here presented.

The Second Amendment was proposed by the Constitutional Convention of 1820. The report of the debates of that convention shows how jealous was the feeling in favor of the town system of government, then universally prevailing, and against any change except in such populous centres as imperatively required some different system. The attachment of the people to the town meeting form of government was profound and its essential characteristics were guarded with sedulous care. It cannot be thought that

the words of the amendment proposed and approved under such circumstances were used or understood in any other than their natural meaning. The inference cannot be escaped that the people intended to place substantial checks upon the power of the General Court to establish cities and so to curb its authority as to give it a right to act to that end only after it had been asked by the inhabitants of a town for incorporation as a city, a request which must be expressed according to the well settled forms of the town meeting.

It sometimes has been suggested that the words of a constitution may be construed in a directory rather than in a mandatory sense. Respecting that matter there is found this cogent and convincing statement in Cooley, Const. Lim. (6th ed.) 93: "Courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they must then be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules by which all departments of the government must at all times shape their conduct; and if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument, and usurping the proper province of ordinary legislation. We are not therefore to expect to find in a constitution provisions which the people, in adopting it, have not regarded as of high importance, and worthy to be embraced in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument, when we infer that such directions are given to any other end. Especially when, as has been already said, it is but fair to presume that the people in their constitution have

expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to implication." Without entering more at large into the discussion of that subject, it is enough to say that the words of the Second Amendment are not susceptible of having any other than the positive and indisputable meaning which their natural significance imports and which we have already amplified. They cannot be treated as mere directions to be disregarded at the will of the Legislature. They are positive bounds to its jurisdiction to act.

This conclusion is supported by the great weight of authority in other jurisdictions. *Prothro* v. *Orr,* 12 Ga. 36, 42, 43. *State v. Bankers' & Merchants' Mutual Benefit Association,* 23 Kans. 499, 501. *Metropolitan Casualty Ins. Co.* v. *Basford,* 31 So. Dak. 149, 166–169. *People* v. *Lawrence,* 36 Barb. 177, 186–188. *Coleman v. Eutaw,* 157 Ala. 327, 336, 337. *State* v. *Osborne,* 14 Ariz. 185, 192. *Crawford* v. *Gilchrist,* 64 Fla. 41. *Varney* v. *Justice,* 86 Ky. 596, 601. *State* v. *Hitchcock,* 241 Mo. 433, 464, 465. *Crabbe* v. *Celeste Independent School District,* 105 Texas, 194, 198. *People* v. *Leddy,* 53 Col. 109, 112, 113. *State* v. *Tibbets,* 52 Neb. 228, 233. *Memphis Street Railway* v. *Byrne,* 119 Tenn. 278, 287. *Fidelity Ins. Trust & Safe Deposit Co.* v. *Shenandoah Valley Railroad,* 86 Va. 1, 5.

Such, then, is the meaning of the Second Amendment. It remains to inquire whether there was conformity thereto in the enactment of Spec. St. 1917, c. 289.

The petition to the General Court for the incorporation of the town of Methuen as a city was signed by the three persons who were the selectmen of the town, alleging themselves to be "citizens of Massachusetts." Against their signatures were written the words "Board of Selectmen." No town meeting was held in Methuen for the purpose of considering the question whether application should be made to the General Court for a city charter, and the town took no action in any manner or form to that end.

It is plain that there was no vote of a majority of inhabitants of Methuen in favor of an application to the General Court for the granting of a city charter at a meeting duly held and warned for that purpose before the enactment of Spec. St. 1917, c. 289.

The proceedings of the town relative and antecedent to the enactment of Spec. St. 1916, c. 116, entitled "An Act to provide for

precinct voting, limited town meetings, town-meeting members, a referendum and an annual moderator in the town of Methuen," all were taken at meetings held without any warning of a purpose to change the form of municipal government. The committee to consider that subject was appointed at a meeting which contained no article whatsoever concerning the subject. The report of that committee recommending application to the Legislature for "the limited town meeting form of government, so called," was made at a meeting containing only an article "To hear reports of committees and act thereon." It does not appear even that a vote adopting this recommendation was passed. Manifestly such proceedings were not had at meetings "warned and holden for that purpose." These words mean that there must be an article in the warrant for the meeting fairly calling attention to the subject as a matter to be considered. It follows that, since action by the town is a necessary prerequisite to a change from a town meeting form of government to a city government, these proceedings do not constitute such action. Hence arguments in behalf of the defendant founded upon *Opinion of the Justices*, 229 Mass. 601, have no relevancy to the present case.

It was conceded during the argument at the bar that the so called limited town meeting had not undertaken in any way to commit the town to the city form of municipal government. Therefore it becomes unnecessary to consider the force and meaning of § 10 of c. 116, Spec. St. 1916.

The joint legislative committee on cities held a public hearing at the town hall in Methuen on March 1, 1917, pursuant to an advertised notice to persons interested in a bill providing for a city charter for Methuen. The hearing was largely attended but the number present is unknown. This was a hearing by a legislative committee. Its conduct and procedure were under the management of that committee. It was not presided over by the moderator of the town; no check list was used and no records kept by the town clerk. That was not a town meeting. It did not purport to be a town meeting. The legislative committee did not undertake to call a town meeting. It had no authority to call a meeting of the voters of the town. That can only be done by a warrant under the hands of the selectmen directed to the constables or other designated persons, and, in the event of their

unreasonable refusal, by a justice of the peace. These provisions
have remained unchanged in substance since St. 1785, c. 75, § 5,
until the present. St. 1913, c. 835, §§ 394, 396. *Walsworth* v.
*Casassa*, 219 Mass. 200. Clearly votes passed at a hearing before
a legislative committee under these circumstances did not con-
stitute an application for a city charter by a majority of the in-
habitants of the town present and voting "at a meeting duly
warned and holden for that purpose" as required by the Second
Amendment.

It is a principle of constitutional law early declared and con-
sistently followed by this court that every rational presumption
is made in favor of the validity of an act of the Legislature, and
its enforcement will not be denied unless its conflict with the
Constitution admits of no reasonable doubt. *Perkins* v. *Westwood*,
226 Mass. 268, and cases collected at page 271. *Norwich* v. *County
Commissioners*, 13 Pick. 60, 61. *In re petition of Mayor & Alder-
men of Northampton*, 158 Mass. 299, 304. *Commonwealth* v. *O'Neil*,
233 Mass. 535, 541. This principle is kept constantly in mind. No
other course, however, is open to us in the case at bar. It is im-
possible to say that a subsequent acceptance by the voters of a
town of a statute establishing it as a city is compliance with the
plain requirement of the Second Amendment to the effect that the
application for the enactment of such a statute must come first
from the town acting under its town meeting form of expression of
public sentiment before the General Court has power or authority
under the Constitution to enact such a statute. We are constrained
to hold that Spec. St. 1917, c. 289, was not enacted in accordance
with art. 2 of the Amendments to the Constitution.

The further question now arises whether the writ ought to
issue under the circumstances here disclosed, notwithstanding the
violation of the Constitution in the enactment of the city charter.
It was said in *Stoughton* v. *Baker*, 4 Mass. 522, 528: "No laches
can be imputed to the government, and against it no time runs so
as to bar its rights." The rule of numerous early English cases
concerning quo warranto is to the same effect. *The King* v. *John*,
8 Mod. 132. *The King* v. *Powell*, 8 Mod. 166. *The King* v. *Pyke*,
8 Mod. 286. *Winchelsea Causes*, Burr. 1962. See however *The
King* v. *Peacock*, 4 T. R. 684. Estoppel does not apply ordinarily
against the exercise of a public right. The interests of the Com-

monwealth usually are held not to be prejudiced by the failure of public officers to do their duty. This rule prevails generally. *Attorney General* v. *Revere Copper Co.* 152 Mass. 444, 449, 451, and cases there collected. *Grand Trunk Western Railway* v. *United States,* 252 U. S. 112, 122. *United States* v. *St. Paul, Minneapolis & Manitoba Railway,* 247 U. S. 310, 314. *People* v. *Long Beach,* 155 Cal. 604. *People* v. *Keigwin,* 256 Ill. 264, 273. *State* v. *Wofford,* 90 Texas, 514. In the absence of some special statutory provision, that principle applies to quo warranto proceedings instituted by the Attorney General in behalf of the Commonwealth. It commonly has been so held. *Commonwealth* v. *Allen,* 128 Mass. 308. *State* v. *Port of Tillamook,* 62 Ore. 332, 334. *State* v. *Pawtuxet Turnpike Co.* 8 R. I. 521. *People* v. *Gary,* 196 Ill. 310, 327.

There is, however, another principle to be considered in this connection. The granting of relief by quo warranto, even when sought at the instance of the Attorney General, in behalf of the public, is not a matter of absolute right but is a subject for the exercise of sound judicial discretion. It is the duty of the court to consider all the conditions, including immediate and remote consequences and to determine with a broad vision of the public weal whether on the whole the common interests demand the issuance of this extraordinary remedy. Where the legality of the organization of a municipality is concerned, then even the Attorney General in his public capacity cannot as of right demand the issuance of quo warranto. His application must be considered in all its bearings as related to the general welfare. One of the grounds on which quo warranto was denied in *Commonwealth* v. *Athearn,* 3 Mass. 285, 287, was said by Chief Justice Parsons at page 287 to be that "in the present case it would not be a discreet and proper exercise of their authority." As Lord Mansfield put it in *The King* v. *Stacey,* 1 T. R. 1, at page 2: "The court are bound to consider all the circumstances of the case, before they disturb the peace and quiet of any" municipal corporation. Where important public interests have become affected and there has been considerable delay, sound judicial discretion may require denial of affirmative action and refusal to oust a municipality from the exercise of its franchise. This proposition is supported by the great weight of authority and no decision to the contrary has come to our attention. *State* v. *Des Moines,* 96 Iowa, 521, 531 to 536. *Jameson* v. *People,* 16 Ill. 257.

*People* v. *Maynard*, 15 Mich. 463, 470. *State* v. *Lincoln Street Railway*, 80 Neb. 333, 346. *State* v. *Leatherman*, 38 Ark. 81, 89. *Soule* v. *People*, 205 Ill. 618, and *People* v. *Union Elevated Railroad*, 269 Ill. 212, 231, where other Illinois cases to the same effect are collected. Cooley, Const. Lim. (7th ed.) 363, 364; (5th ed.) 311. See *Rumsey* v. *People*, 19 N. Y. 41; *Lanning* v. *Carpenter*, 20 N. Y. 447.

In this particular the practice touching quo warranto conforms to that which prevails as to other extraordinary writs. The granting of the writ of mandamus is not a matter of right but rests in sound judicial discretion. *Smith* v. *Commissioner of Public Works of Boston*, 215 Mass. 353, and cases collected. The same is true of the writ of certiorari. *Sears* v. *Mayor & Aldermen of Worcester*, 180 Mass. 288, and cases cited. *Swan* v. *Justices of the Superior Court*, 222 Mass. 542.

The present information, although brought by the Attorney General "in behalf of the Commonwealth," is also averred to be "at the relation of Charles W. Mann, of Methuen in the County of Essex." The concluding paragraph of the information opens with these words: "Wherefore, the Attorney-General upon relation of Charles W. Mann, as aforesaid, prays. . . ." The only facts revealed by the record concerning the relator are that he was present and took part in the hearing before the legislative committee at the town hall in Methuen on March 1, 1917, and there stated "that the town ought to have the right of voting whether it wanted a charter or not;" that since the alleged adoption of the charter he has once been nominated as a candidate for the city council, not at that time having actual knowledge of any constitutional defect in the city charter, and that as soon as he knew of the alleged defects he objected to the validity of the charter by disclosing to the Attorney General the defects set forth in the information. Although the brief for the informant before this court is signed by the Attorney General and one of his assistants, it is also signed by counsel for the relator and the only oral argument was made by counsel for the relator. The permission of such argument must not be taken as a precedent. The granting of a city charter is an attribute of the sovereign power. It cannot be assailed in this form of proceeding by one who has only the standing of a private citizen. An information of this nature must be prosecuted

by and in behalf of the Commonwealth and by or under the immediate supervision of the Attorney General and in that way alone. *Attorney General* v. *Adonia Shomo Corp.* 167 Mass. 424. *Haupt* v. *Rogers,* 170 Mass. 71. R. L. c. 192, §§ 6–13. See *McGlue* v. *County Commissioners,* 225 Mass. 59.

If the name of the relator be rejected as surplusage, enough would remain to show that the information was filed by the Attorney General in behalf of the Commonwealth. The case is treated on that footing.

The relief sought is to have a judgment of ouster against a municipality from exercising the functions of a city because a statute, which has received the affirmative action of the legislative department of government and the approving signature of the Governor, is contrary to the fundamental law. The establishment of a city in place of a town form of government is the exercise of a legislative function of a high order. It involves immediate and important public interests. A city charter cannot in the nature of things be enacted except after a generous degree of publicity. This charter was approved by the Governor on April 17, 1917. A period of nearly nine months elapsed before a city government was inaugurated upon its supposed authority. During that period of course the validity of the charter might have been tested in appropriate proceedings. See *Graham* v. *Roberts,* 200 Mass. 152. The inauguration and maintenance of a city government is full of publicity. Methuen has been recognized as a city by the General Court in several statutes enacted subsequent to Spec. St. 1917, c. 289. See St. 1919, c. 340; St. 1920, c. 83; Spec. St. 1918, cc. 36, 184. See also Spec. St. 1919, c. 215. State taxes have been assessed upon Methuen as a city, the collection of which must have been made through the instrumentality of those purporting, under Spec. St. 1917, c. 289, to be officers of the city. Sts. 1918, c. 279; 1919, cc. 344, 346; 1920, cc. 557, 612. The same is true of county taxes. St. 1919, c. 343. The population of the town of Methuen according to the State census of 1915 was slightly in excess of fourteen thousand. It is manifest that in so large a community considerable sums of money must have been raised by taxation and expended for public uses. All the manifold activities of a municipality have been carried on for about two years and a half under the supposed authority of Spec. St. 1917, c. 289, as a valid city charter before

the filing of this information. Many contracts must have been made in reliance upon its assumed force. It must be presumed that the public schools have been kept, teachers employed, police and fire protection afforded, highways constructed and maintained, the poor relieved, and other necessary attributes of the government of a city performed. It is quite possible that the power of eminent domain has been exercised. Money doubtless has been borrowed and the credit of the city in form pledged for its payment. Without further enumeration, it is manifest that great havoc in divers directions that can be foreseen, and doubtless in sundry others not now in mind, would be wrought by issuing a quo warranto against Methuen for usurping the franchise of a city. The evil consequences which would flow from issuing the quo warranto would not be in any measure lessened by the circumstance that the Attorney General had no knowledge of the invalidity of the city charter of Methuen until it was called to his attention by the relator. There must be timely assertion even of constitutional rights. Ignorance of pertinent facts is not generally an excuse for failure to vindicate them seasonably. *Lebowitch, petitioner,* 235 Mass. 357.

All these considerations lead to the conclusion that it would not be a discreet exercise of judicial power and would not be in conformity to the general public interest to grant the relief prayed for. Whatever legal consequences may flow from the fact that the city charter of Methuen is an unconstitutional statute must be met as and when they arise. Our refusal, in the exercise of sound judicial discretion, to issue the extraordinary writ of quo warranto under the circumstances, cannot affect those consequences. Those consequences may be alleviated so far as possible by taking the obvious steps to remedy the present situation, and to put Methuen upon the basis of a constitutional charter.

*Information dismissed.*