# OPINIONS OF THE JUSTICES.

### Opinion of the Justices to the Senate.

*Constitutional Law*, Initiative petition, Amendment of the Constitution, Elections, Opinions of the Justices. *Initiative. Elections*, Term limitation. *Supreme Judicial Court*, Opinions of the Justices.

A proposed initiative petition seeking to amend the Constitution of the Commonwealth by adding a constitutional term limitation provision for certain elected offices would not be inconsistent with the rights of individuals as presently declared in the Declaration of Rights, and is not, therefore, excluded from the initiative petition process by § 2 of art. 48, The Initiative, II, of the Amendments to the Massachusetts Constitution. [1204-1215]

Provisions of a proposed initiative petition seeking to amend the Constitution of the Commonwealth by adding a constitutional term limitation for certain elected officials contain only related matters, consistent with art. 48; The Initiative, II, of the Amendments to the Massachusetts Constitution. [1215-1216]

The Justices declined to respond further to the Senate on questions regarding the constitutionality of a proposed initiative petition under the United States Constitution, where the Federal constitutional issues presented, in addition to being highly complex, are ones which have not yet been considered, in any respect, by the United States Supreme Court or by Federal trial or appellate courts. [1216-1217]

On July 7, 1992, the Justices submitted the following answers to questions propounded to them by the Senate.

To the Honorable the Senate of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court respectfully submit their responses to the questions set forth in an order adopted by the Senate on May 13, 1992, and transmitted to this court on May 19, 1992. The order recites that House No. 4000, an initiative petition entitled "Initia-

tive Amendment to the Massachusetts Constitution limiting
the terms of office of governor, lieutenant governor, secre-
tary, treasurer, attorney general, auditor, councillor, state
senator, state representative, United States senator and rep-
resentative in congress," is an amendment to the Constitu-
tion of the Commonwealth pending before the General Court
which seeks to add an additional qualification for persons
seeking election to particular public offices, and that grave
doubt exists as to the constitutionality of the initiative
amendment, if finally approved. The initiative petition pro-
poses amendments to Part II, c. 2, § 1, art. 2; Part II, c. 2,
§ 2, art. 1; Part II, c. 1, § 2, art. 5, of the Massachusetts
Constitution; and arts. 101, 16, and 17 of the Amendments
to the Massachusetts Constitution, adding the following ad-
ditional sentences to the specified sections, as appropriately
revised:

> "No person shall be qualified to be elected as [Gover-
> nor], [Lieutenant Governor], [Secretary, Treasurer,
> Auditor, or Attorney General], [Councillor], [Senator
> or Representative] who has held that office for [two]
> [four] consecutive terms within the [nine] [eleven] year
> period immediately preceding the election, provided
> that such terms of office began on or after January 1,
> 1995. For the purpose of this Article, any person [who
> succeeds to the office of Governor] [appointed or elected
> to such office] [appointed or elected to such offices], and
> who serves more than one-half of a term of that office,
> shall be considered to have served a term of that office."

The initiative petition further amends the Amendments to
the Massachusetts Constitution by adding the following new
article, to be numbered sequentially:

> "ARTICLE _____. No United States Senator from
> Massachusetts shall serve more than two consecutive
> terms in the United States Senate and no Representa-
> tive in Congress from Massachusetts shall serve more
> than four consecutive terms in the United States House
> of Representatives. Any person appointed or elected to
> the United States Congress, and who serves more than

one-half of a term of such office, shall be considered to have served a term of that office for the purposes of this Article. The requirements of this Article shall apply to terms of office beginning on or after January 1, 1995."

The order presents this court with the following questions:

"1. Is the subject matter of House No. 4000 which adds certain new qualifications for persons seeking certain elected offices 'inconsistent with the rights of individuals, as presently declared in the declaration of rights,' in particular, Art. IX of said declaration of rights and is therefore excluded from initiative petition under section 2 of Art. XLVIII of the Constitution of the Commonwealth?

"2. Would the provisions of House No. 4000 which establishes a qualification for the office of senator and representative in the congress of the United States, if finally approved, be in conflict with, and therefore in violation of, Article I of the Constitution of ·the United States which specifies the qualifications for such office?

"3. Would the provisions of House No. 4000, if finally approved, exceed the power given to the states in Section 4 of said Article I of the Constitution of the United States which provides that the state legislature shall set the 'time, places and manner of holding elections for senators and representatives' in congress, but reserves to the congress the power to 'make or alter such regulations'?

"4. Would the provisions of House No. 4000, if finally approved, violate the provisions of section 5 of said Article I of the Constitution of the United States which, in part, states that Congress 'shall be the judge of the elections, returns and qualifications of its own members'?

"5. Do the provisions of House No. 4000 violate the provisions and intent of Art. XLVIII of the Amendments to the Constitution of the Commonwealth in that Part VII of said House No. 4000 contains matters that are not related to or mutually dependent on the other parts of said House No. 4000?"

We invited interested parties to submit briefs. In response, we received briefs from the Attorney General and an amicus curiae, Term Limits Legal Institute and Term Limits Proponents, both of which support the initiative measures. The Governor filed a letter supporting House No. 4000 and joining in the arguments presented in the briefs. No brief was filed against the initiative measures.

1. *The Massachusetts Constitution and term limitations.* The right of the people to amend the Massachusetts Constitution through the initiative process is not absolute. Article 48, the Initiative, II, § 2, of the Amendments to the Massachusetts Constitution, precludes the use of the initiative procedure to enact any statute or constitutional amendment that is inconsistent with the freedom of elections provision of the Declaration of Rights.[1] We must interpret the language of art. 48 "in 'a sense most obvious to the common understanding at the time of its adoption,' because it is proposed for public adoption and must be understood by all entitled to vote." *Attorney Gen.* v. *Methuen,* 236 Mass. 564, 573 (1921), quoting *Bishop* v. *State,* 149 Ind. 223, 230 (1898). See *Cohen* v. *Attorney Gen.,* 357 Mass. 564, 571 (1970). An examination of the records of the debates and proceedings of the Constitutional Convention of 1917-1918, from which art. 48 emerged, helps to clarify the conditions under which it came into existence, how it was received and understood by that convention, and, consequently, how it was commonly understood at the time of its adoption. See *Cohen* v. *Attorney Gen., supra* at 571-572; *Loring* v. *Young,* 239 Mass. 349, 368 (1921); *Opinion of the Justices,* 233 Mass. 603, 604-605 (1920).

"We note that one of the main issues in the campaign for the election of delegates to the Constitutional Convention of 1917-1918 was whether the Constitution should be amended

---

[1]Article 48, The Initiative, II, § 2, states, in relevant part: "No proposition inconsistent with any one of the following rights of the individual, as at present declared in the declaration of rights, shall be the subject of an initiative or referendum petition: . . . freedom of elections . . . ."

by adding provisions for the Initiative and Referendum. The issue received considerable newspaper coverage before as well as during the convention. Groups and committees on both sides of the issue sought commitments from candidates during the campaign." *Cohen* v. *Attorney Gen., supra* at 572. The initiative and referendum issue also became the major issue at the convention itself. "If a convenient, correct and historic name is wanted for the Massachusetts constitutional convention which met first in 1917, the name of 'the I. & R. Convention' would have high claim for preference. From the beginning of the convention the element which wanted the initiative and referendum amendment was the controlling factor, or their subject was the dominating subject. After the matter was disposed of, the hiatus left by its omission from the program had its influence upon all subsequent proceedings in way of reduced attendance and comparative want of interest, accompanied by lack of devotion to duty." R.L. Bridgman, Massachusetts Constitutional Convention of 1917, 41 (1923). "The debate and proceedings on the Initiative and Referendum provisions which we now find in art. 48 took more time of the convention than any other subject or proposal before it. The debates on the proposal, and on suggested amendments thereto, consumed most of the time of the convention from August 7, 1917, to November 28, 1917. It took the entire 1,086 pages of Volume 2 Debates in the Massachusetts Constitutional Convention of 1917-1918 to record the debates and proceedings on the Initiative and Referendum amendment." *Cohen* v. *Attorney Gen., supra* at 572-573.

Joseph Walker of Brookline was the floor leader for the initiative and referendum amendment throughout the constitutional convention, and George B. Churchill of Amherst eventually became the recognized floor leader of the opponents of the initiative and referendum. R.L. Bridgman, *supra* at 48. After the opponents of the initiative and referendum were unable to prevent the amendment to the Constitution through the initiative process, Churchill proposed excluding only the provisions of the Declaration of Rights from the ini-

tiative petition process, and his motion succeeded by a vote of 127 to 126 on October 17, 1917. 2 Debates in the Constitutional Convention 1917-1918, 737-739 (1918). Concerned that, if social welfare legislation should be found unconstitutional as had happened with mandatory workers' compensation legislation in New York, the people would not be able to amend the Declaration of Rights through the initiative process to make this type of legislation constitutional, Walker sought reconsideration which failed by a 117-to-124 vote. *Id.* at 739-740. After further debate on the relationship between social welfare legislation and the Declaration of Rights, Walker's motion to strike out the previously adopted Churchill amendment passed by a 147-to-137 vote in mid-November, 1917. *Id.* at 948. Churchill's subsequent attempt to reinstitute his initial amendment failed, and the convention eventually adopted, by a vote of 107 to sixty-six, a motion by John Merriam of Framingham which became the present language of art. 48, The Initiative, II, § 2, which now concerns us. *Id.* at 1000-1003. Merriam's amendment, while opposed by Walker and other proponents of the initiative and referendum, excluded the major individual rights provisions, but not the property rights provisions, of the Declaration of Rights from the initiative process in order to win over those delegates concerned about social welfare legislation.

The same constitutional convention, while excluding amendments inconsistent with freedom of elections from the initiative process, adopted art. 64 of the Amendments to the Massachusetts Constitution which, in § 2, limited the terms of the office of the Treasurer and Receiver General (Treasurer) to three successive terms. See 3 Debates in the Constitutional Convention 1917-1918, 89-151 (1920). The primary purpose of art. 64, which engendered the most debate, was the provision for biennial terms for elected State offices. There was no recorded debate concerning the merits of the limitation on the term of office of Treasurer within § 2 of art. 64.

The lack of debate over this issue probably stems from the historical limitation on the terms of the office of Treasurer.

As initially provided in Part II, c. 2, § 4, art. 1, of the Massachusetts Constitution, the Treasurer was chosen annually by joint ballot of the senators and representatives, and "that the citizens of this Commonwealth may be assured, from time to time, that the moneys remaining in the public treasury . . . are their property," no individual could serve more than five successive years in the office of Treasurer. Journal of the Convention for Framing a Constitution of Government for the State of Massachusetts Bay 241-242 (1832) (hereinafter, Journal of the Convention). Article 64 was similar to an unratified amendment of the Constitutional Convention of 1853, except that the 1853 amendment provided for annual rather than biennial elections. See 3 Debates and Proceedings in the State Convention 1853, 683-684 (1853). After the voters failed to ratify the 1853 amendments, the Legislature during the 1854 and 1855 sessions adopted, and the voters ratified on May 23, 1855, art. 17 of the Amendments to the Massachusetts Constitution, which provided for the direct election of Treasurer. There was, however, no stated limitation on the term of office of Treasurer in art. 17 as there had been in the unratified 1853 amendment.

According to *Opinion of the Justices*, 243 Mass. 605 (1923), however, because there was nothing in art. 17 concerning the terms of office of Treasurer, the original prohibition against more than five successive years in office remained in effect. *Id.* at 607. According to the Justices, the new provision in art. 64 concerning the limitation on the office of Treasurer to three successive terms rendered nugatory the inconsistent preexisting provisions of Part II, c. 2, § 4, art. 1. *Id.* at 607-608. Article 64 was later amended by art. 82, which was adopted by the Legislature in the 1961 and 1963 sessions and ratified by the voters on November 3, 1964. This article eliminated the term limitation on the office of Treasurer and provided for quadrennial terms for Statewide elected offices.

That the delegates to the 1917-1918 constitutional convention, who not only approved the initiative and referendum amendment but also excluded various individual rights, in-

cluding the freedom of elections provision, within the Declaration of Rights from the initiative process, adopted the relevant language in § 2 of art. 48, The Initiative, II, while specifically limiting the terms of office of Treasurer is persuasive evidence that limiting the terms of elected State offices is not inconsistent with the freedom of elections in the Declaration of Rights. That the term of Treasurer, after it became subject to popular election, was limited for over one hundred years also lends support to this position. See *Colo v. Treasurer & Receiver Gen.*, 378 Mass. 550, 557 (1979) ("The long history of a certain practice . . . and its acceptance as an uncontroversial part of our national and State tradition do suggest that we should reflect carefully before striking it down"). These various limitations on the office of Treasurer, however, were accomplished through amendment processes that were not subject to the restrictions on the initiative petition process within § 2 of art. 48, The Initiative, II.[2] One could still argue, therefore, that these limitations, although constitutional, would be unconstitutional if enacted through the initiative petition process because they are inconsistent with the freedom of elections provision of the Declaration of Rights.[3] See *id.* ("mere fact that a certain practice has gone unchallenged for a long period of time cannot alone immu-

---

[2]The other two methods for amending the Constitution are through a constitutional convention and through a legislative amendment. See *Cohen v. Attorney Gen.*, 357 Mass. 564, 573 (1970). These processes are not constitutionally limited, as is the initiative process, to provisions consistent with the individual rights of the Declaration of Rights.

[3]The inconsistency between the five-year limitation on the office of Treasurer in Part II, c. 2, § 4, art. 1, of the Massachusetts Constitution, which was not repealed by art. 17, and the three-term limitation in art. 64, required a response from the Justices. *Opinion of the Justices*, 243 Mass. 605 (1923). Even though this problem was brought to the attention of the other delegates by Alfred Washburn of Middleborough, the delegates failed to remedy this situation. See 3 Debates in the Constitutional Convention 1917-1918, 136-137 (1920). One observer, strongly opposed to biennial elections, attributed the problem with the adoption of art. 64 to the "restlessness and impatience" of the delegates at the later stages of the convention. R.L. Bridgman, Massachusetts Constitutional Convention of 1917, 82-83, 90 (1923).

nize it from constitutional invalidity"). See also 1 Op. Att'y
Gen. 453 (1897) ("an act which should attempt to limit the
number of times to which a citizen could be elected to the
Office of Governor . . . would be in violation of the spirit if
not the letter of art. IX of the Declaration of Rights"). It is
necessary, therefore, to examine the Declaration of Rights it-
self to determine if there is any inconsistency between term
limitations and the freedom of elections.

The Senate, which requested this opinion, has indicated,
through Question 1, that its major concern is with any poten-
tial inconsistency between term limitations and art. 9 of the
Declaration of Rights, which reads as follows: "All elections
ought to be free; and all the inhabitants of this Common-
wealth, having such qualifications as they shall establish by
their frame of government, have an equal right to elect of-
ficers, and to be elected, for public employments." The lan-
guage of art. 9 itself does not clearly answer the question.
Since "[w]e recognize that each Legislature elected for a two
year term is a unique body," *Lamson* v. *Secretary of the
Commonwealth*, 341 Mass. 264, 273 (1960), it may be asked
how the inhabitants of the Commonwealth can be said to
have "an equal right" to be elected to that "unique body" if
some of them are absolutely barred because of their election
to prior Legislatures? At the same time, art. 9 clearly envi-
sions some limitations on the right to be elected to office
through the establishment of qualifications for elected offices.

Our prior decisions construing art. 9 also do not provide us
with clear guidance for approaching this task. On several oc-
casions this court has stated that the right to be elected, pre-
served in art. 9, is not absolute but "is subject to legislation
reasonably necessary to achieve legitimate public objec-
tives."[4] *Opinion of the Justices*, 375 Mass. 795, 811 (1978).

---

[4]We note, however, that most of these prior decisions and opinions dealt
with regulating elections, a power which is included in the Legislature's
authority under Part II, c. 1, § 1, art. 4, of the Massachusetts Constitu-
tion. See *Opinion of the Justices*, 375 Mass. 795, 810 (1978) (requiring
candidates to file statements of financial interest "would not add to the
qualifications for constitutional public offices"); *Opinion of the Justices*,

See *Opinion of the Justices*, 368 Mass. 819, 823 (1975). On the other hand, we have also characterized the right to be elected under art. 9 as "of fundamental importance in our form of government" and a "basic right." *Batchelder* v. *Allied Stores Int'l, Inc.*, 388 Mass. 83, 91, 93 (1983).

Cases decided in other jurisdictions and under Federal law are unhelpful, because we are aware of no decision dealing directly with the issue that we must decide under the language of our own Massachusetts Constitution — whether the proposed term limitations amendment, if enacted, would be inconsistent with the fundamental right to be elected to public offices under art. 9. See *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 249-250 (1946). To answer this question, therefore, we must look to the framers of our Constitution, and to art. 9 in particular, to interpret its language "in a sense most obvious to the common understanding at the time of its adoption." *Attorney Gen.* v. *Methuen*, 236 Mass. 564, 573 (1921), quoting *Bishop* v. *State*, 149 Ind. 223, 230 (1898).

The author of art. 9 was John Adams. See Bacon, The State Constitution, 3 Commonwealth History of Massachusetts 189-190 (A. Hart ed. 1929). The Constitutional Convention of 1779-1780 made only minor changes in Adams's

---

368 Mass. 819, 822 (1975) (barring independent candidates from ballot if a member of a political party within twenty-eight days of the last day for filing nomination papers). The issue in *LaBarge* v. *Chief Administrative Justice of the Trial Court*, 402 Mass. 462 (1988), was whether the judicial branch of the Commonwealth could regulate the conduct of its employees through a collective bargaining agreement that requires judicial employees to take leaves of absence if they become candidates for public office. *Id.* at 464-466. The affected individual in this case was not barred from seeking public office, but only from working for the judicial branch while seeking or serving in an elected office. While any of these regulations may have had a secondary effect of precluding an individual from seeking a public office, none of these regulations totally barred otherwise qualified inhabitants from seeking a particular public office at a particular time, as does the proposed term limitations amendment. See Note, Limits on Legislative Terms: Legal and Policy Implications, 28 Harv. J. on Legis. 565, 587-589 (1991) (distinguishing term limitations from "resign-to-run" and "ballot-access" provisions).

initial draft of art. 9.[5] Adams, who was in Philadelphia when Pennsylvania's Constitution was adopted in August, 1776, took art. 9 almost verbatim from art. 7 of the Declaration of Rights of the Pennsylvania Constitution.[6] See R. Taylor, Construction of the Massachusetts Constitution, reprinted from 90 Proceedings of the American Antiquarian Society (pt. 2), 330-331 (Oct., 1980). Pennsylvania's Constitution, in spite of art. 7, also provided for term limitations for certain elected officials, as did all the early State Constitutions except for those of the New England States.[7] W.P. Adams, The

---

[5]Adams's initial draft of art. 9 reads as follows: "All elections ought to be free; and all the male inhabitants of this Commonwealth, having sufficient qualifications, have an equal right to elect officers, and to be elected for public employments." Journal of the Convention 194 (1832). The delegates to the convention deleted the word "male," and changed "sufficient qualifications" to "such qualifications as they shall establish by their frame of government."

[6]Article 7 of Pennsylvania's Constitution of 1776 reads as follows: "That all elections ought to be free; and that all free men having a sufficient evident common interest with, and attachment to the community, have a right to elect officers, or to be elected into office." 5 F.N. Thorpe, Federal and State Constitutions, Colonial Charters, and Other Organic Laws 3083 (1909). Pennsylvania's art. 7, in turn, relied heavily on § 6 of the Virginia Constitution's Bill of Rights, which reads as follows: "That all elections ought to be free; and that all men, having sufficient evidence of permanent common interest with, and attachment to, the community, have the right of suffrage . . . ." 1 A.E. Howard, Commentaries on the Constitution of Virginia 86 (1974). "The guarantee of free elections recalls the time when English kings interfered with the election of members of Parliament. Royal instructions and recommendations to election officials and interference in the elections themselves had taught the colonists the value of being able to conduct elections free from external influences." Id.

[7]While South Carolina made no provision for term limitations in its Constitution of 1776, it added term limitations for several elected positions in its Constitution of 1778. W.P. Adams, First American Constitutions 253, 310-311 (1980). The Articles of Confederation also contained term limitations on delegates to Congress. Art. of Confed., art. V, cl. 2, reprinted in 1 F.N. Thorpe, Federal and State Constitutions, Colonial Charters, and Other Organic Laws 9, 11 (1909).

The initial proposed Constitution for this Commonwealth, rejected by the voters in 1778, failed to provide for term limitations, and this deficiency was pointed out by returns from at least two areas of the State. The returns from Lexington included the following statement: "A Rotation . . . hath been frequently suggested, and earnestly recommended, by the best

First American Constitutions 308-311 (1980). John Adams himself expressed at least lukewarm support for the notion of term limitations during the development of many of these first State Constitutions.[8] It is interesting to note, however,

---

Writers on Policy and Government . . . and we could have wished, that the Example of the Honorable Congress, in the Articles of Confederation, had been adopted in this matter: — And that no Citizen of this State had been Eligible to the Office of Supreme Magistrate, or as a Member of the General Court, more than Two Years in Five, Three Years in Seven, or, at least for some limited Term." Popular Sources of Political Authority 317-318 (O. Handlin & M. Handlin eds. 1966). Voters from twelve of the twenty-one towns in Essex County met in a convention to consider their reactions to the Constitution of 1778, from which emerged "The Essex Result," which "had a powerful impact upon the substantive development of the constitution ultimately adopted by the people of Massachusetts." Cella, The People of Massachusetts, A New Republic, and the Constitution of 1780: The Evolution of Principles of Popular Control of Political Authority, 1774-1780, 14 Suffolk U.L. Rev. 975, 993 (1980). The Essex Result included a suggestion for term limitations: "As a further security against any inconveniency resulting from the length of time a Governor may hold the chair, no man ought to be a Governor more than three years in any six. . . . [A] rotation also of the senators will prevent any undue influence a man may acquire, by the long possession of an important office. . . . And let one fourth of the senate . . . be annually made ineligible to that rank, for two years . . . ." Popular Sources of Political Authority, *supra* at 361-362.

[8]In a 1776 letter to John Penn of North Carolina, who was returning home from the national congress to participate in the drafting of a plan of government for his colony and had requested suggestions from John Adams, Adams made the following suggestions concerning term limitations, then referred to as rotation in office: "A Rotation of Offices, in the Legislative and Executive Departments has many Advocates and, if practicable might have many good Effects. A Law may be made that no Man shall be Governor, Lt. Governor, Secretary, Treasurer, Councillor, or Representative more than three Years at a Time, nor be again eligible untill after an Interval of three Years." Thoughts on Government, in 4 Papers of John Adams 83 (R. Taylor ed. 1979). In a similar letter to George Wythe of Virginia, written shortly after the letter to Penn, Adams expressed a similar sentiment: "A ROTATION of all offices, as well as of Representatives and Councillors, has many advocates, and is contended for with many plausible arguments. It would be attended no doubt with many advantages, and if the society has a sufficient number of suitable characters to supply the great number of vacancies which would be made by such a rotation, I can see no objection to it. These persons may be allowed to serve for three years, and then excluded three years, or for any longer or shorter term." *Id.* at 90.

that Adams's initial lukewarm support of term limitations eventually turned into outright opposition.[9]

Whatever the personal views of John Adams at the time of the drafting of the Massachusetts Constitution, it is noteworthy that his own initial draft of the Constitution contained a term limitation on the office of Governor.[10] Adams apparently believed that a term limitation for this office was a necessary trade-off for the other extraordinary powers he would have granted to the Governor, such as an absolute veto.[11]

---

[9]In Defence of the Constitutions of Government of the United States of America, published in 1787, Adams made the following observations about rotations in office: "But to consider the subject in one other point of view, let us introduce the idea of a rotation, by which is here meant, not merely vacating a seat, which the electors may fill again with the same subject, but a fundamental law, that no man shall serve in the sovereign assembly more than one year, or two or three years, or one in three, or three in six, &c.; for example, suppose England, or any one of the United States, governed by one sovereign assembly, annually elected, with a fundamental law, that no member should serve more than three years in six; what would be the consequence? In the first place, it is obvious that this is a violation of the rights of mankind; it is an abridgement of the rights both of electors and candidates. There is no right clearer, and few of more importance, than that the people should be at liberty to choose the ablest and best men, and that men of the greatest merit should exercise the most important employments; yet, upon the present supposition, the people voluntarily resign this right, and shackle their own choice. This year the people choose those members who are the ablest, wealthiest, best qualified, and have most of their confidence and affection. In the course of the three years they increase their number of friends, and consequently their influence and power, by their administration, yet at the end of three years they must all return to private life, and be succeeded by another set, who have less wisdom, wealth, and virtue, and less of the confidence and affection of the people." 6 Works of John Adams 52-53 (C.F. Adams ed. 1851).

[10]Adams's initial Part II, c. 2, § 1, art. 14, of the Constitution, read as follows: "And to prevent an undue influence in this Commonwealth, which the first magistrate thereof may acquire, by the long possession of the important powers and trusts of that office; as also to stimulate others to qualify themselves for the service of the public in the highest stations, no man shall be eligible as Governor of this Commonwealth, more than five years in any seven years." Journal of the Convention 207 (1832).

[11]Adams's grandson, Charles Francis Adams, believed that this was the case. "[I]n analyzing the theory upon which this plan is based, it is obvious that [rotation of the Governor's office] was incorporated for the purpose of counterbalancing the effect of the gift in other sections of such extensive powers as might make the chief magistrate's place the object of great con-

The delegates to the convention, apparently recognizing this trade-off, decided to dilute the powers of the Governor by allowing the Legislature to override a Governor's veto, and the delegates then voted against the initial draft's limitation on the terms of the office of Governor.[12] Although there is no record of the specific debates that took place during the convention concerning the term limits on the office of Governor, the Journal of the Convention, *supra,* indicates that the vote against term limits had more to do with political compromises over the powers of the office of Governor rather than with any concern with the fundamental individual rights within the Declaration of Rights. Consequently, we find nothing in the record of the convention to indicate that term limitations for elected offices are inconsistent with the freedom of elections.

Article 8 of the Declaration of Rights provides additional support for this conclusion.[13] See *Opinion of the Justices,*

---

tention." 4 Works of John Adams 251 n.1 (C.F. Adams ed. 1851). John Adams himself had made this trade-off explicit in a 1776 letter to another delegate of North Carolina, William Hooper: "There should be a third Branch which for the Sake of preserving old Style and Titles, you may call a Governor whom I would invest with a Negative upon the other Branches of the Legislature and also with the whole Executive Power, after divesting it of most of those Badges of Domination call'd Prerogatives. I know that giving the Executive Power a Negative upon the Legislative, is liable to Objections, but it seems to be attended with more Advantages than Dangers, especially if you make this Officer elective annually, and more especially if you establish a Rotation by which no Man shall be Governor for more than three years." Thoughts on Government, in 4 Papers of John Adams 76 (R. Taylor ed. 1979).

[12]See 4 Works of John Adams 251 n.1 (C.F. Adams ed. 1851) ("The convention preferred to take away the powers, on the one hand, and withdraw the limitation, on the other"). When John Adams's term limitation clause was first taken up by the convention, the delegates explicitly voted to postpone any action on that clause until they had considered the Governor's veto powers. See Journal of the Convention, *supra* at 106. John Adams himself, having left on a mission to France, did not participate in any of the sessions dealing with this issue. Bacon, The State Constitution, 3 Commonwealth History of Massachusetts 190 (A. Hart ed. 1929).

[13]Some publications of the Massachusetts Constitution introduce art. 8 with headings such as "Right of People to Secure Rotation in Office" and "Rotation in Office." While this appears to be evidence that term limita-

291 Mass. 578, 586 (1935) (provisions of the Constitution "are to be construed and interpreted in combination with each other"). Article 8 reads as follows: "In order to prevent those, who are vested with authority, from becoming oppressors, the people have a right, at such periods and in such manner as they shall establish by their frame of government, to cause their public officers to return to private life; and to fill up vacant places by certain and regular elections and appointments." A constitutional term limitation provision, established by the voters through the initiative process, that causes elected officials to return to private life for two years can hardly be said to be inconsistent with art. 8.

Therefore, we conclude that House Bill No. 4000 is not inconsistent with the rights of individuals as presently declared in the Declaration of Rights, and is not, therefore, excluded from the initiative petition process by § 2 of art. 48, The Initiative, II. We answer Question 1, "No."

2. *Related subjects under art. 48.* "Article 48 requires that an initiative measure contain only subjects 'which are related or which are mutually dependent.' " *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth*, 384 Mass. 209, 216-217 (1981), quoting art. 48, The Initiative, II, § 3, as amended by art. 74 of the Amendments. This constitutional requirement directs that the subjects of the initiative petition be related; it does not limit the initiative petition to a single subject. *Massachusetts Teachers Ass'n, supra* at 218-219. In determining whether the subjects dealt with in an initiative petition are "related subjects" for purposes of compliance with the art. 48 limitation, this court inquires as to whether "one can identify a common purpose to which each subject of an initiative petition can reasonably be said to be germane." *Id.* at 219-220. Where such a common purpose can be identified, the relatedness requirement is deemed to have been fulfilled. *Id.*

---

tions or rotations in office are rights expressly granted by art. 8, these headings are editorially supplied and are not part of the Massachusetts Constitution.

The specific subjects of the several provisions of House No. 4000 deal directly and exclusively with the general subject of political term limitations. That each of the provisions of House No. 4000 refers to distinct political offices in different branches and levels of government is not a justification for concluding that the initiative petition contains unrelated subjects in violation of art. 48. House No. 4000, in our opinion, contains only related matters, consistent with art. 48, and, therefore, we answer Question 5, "No."

3. *Constitutionality of term limits for Federal offices.* "The right of the Legislature, Governor, or Council to require the opinions of the Justices is set forth and limited in the Massachusetts Constitution by Part II, c. 3, art. 2, as amended by art. 85 of the Amendments, which states: 'Each branch of the legislature, as well as the governor or the council, shall have authority to require the opinions of the justices of the supreme judicial court, upon important questions of law, and upon solemn occasions.' " *Answer of the Justices*, 373 Mass. 898, 900-901 (1977). Article 85 authorizes the Justices of the Supreme Judicial Court to advise the members of the State's executive and legislative branches on matters involving the performance of their duties, consistent with the Constitution of the Commonwealth. *Id.* at 901. Where the opinion of the Justices on a particular issue would not assist the requesting body in carrying out its duties, however, the Justices will refrain from rendering such an opinion. *Answer of the Justices*, 364 Mass. 838, 844 (1973). Accordingly, the Justices have in the past "beg[ged] to be excused" from opining as to the constitutionality of certain initiative measures under the United States Constitution, where to do so would have them speculate as to the decision the United States Supreme Court likely would reach if confronted with the same issue. *Opinions of the Justices*, 357 Mass. 787, 798 (1970).

The United States constitutional issues presented in the subject order, in addition to being highly complex, are ones which have not as yet been considered, in any respect, by the United States Supreme Court or by Federal trial or appellate

courts. In fact, only one State appellate court has reported a decision regarding the question of political term limitations, and that court declined to formulate an opinion on the Federal issues involved. See *Advisory Opinion to the Attorney Gen.*, 592 So. 2d 225 (Fla. 1991).[14] Therefore, for this court to address the questions posed by the Senate regarding the constitutionality of the initiative under the United States Constitution, we would have to predict the view the Supreme Court ultimately would take on the issue of Federal term limitations, speculating as well as to the basis on which the Justices would rely to support that view. We are not inclined to engage in such forecasting, primarily because any view we might take on this issue would not serve the purpose for which our advice is properly given under art. 85; i.e., to assist the Legislature in performing its present duties. *Answer of the Justices*, 373 Mass. at 901. Regardless of our opinion on these issues, the Supreme Court may ultimately decide otherwise, so "[o]ur advice would be at best tentative and dependent on factors over which we have little control." *Answer of the Justices*, 373 Mass. at 903. In similar circumstances, we have concluded that "it is a question of policy for the General Court whether to adhere to proposed legislation and run the risk of a declaration of invalidity from the highest judicial tribunal." *Id.*, and cases cited. On this basis, we have in the past excused ourselves from answering questions of first impression under the United States Constitution. Since we cannot confidently and properly proceed to respond to the questions placed before us, we again respect-

---

[14]In *Advisory Opinion to the Attorney Gen.*, 592 So. 2d 225, 227 n.2 (Fla. 1991), the opponents of an initiative petition providing for limited political terms for certain elective offices argued that the proposed amendment "unconstitutionally restricts First Amendment rights and that the limitation on the terms of federal legislators violates the Supremacy Clause of the United States Constitution." The Supreme Court of Florida concluded that these challenges presented nonjusticiable issues in that proceeding, citing the fact that the Florida constitutional provision allowing for advisory opinions provided only for the court to advise as to the constitutionality of particular issues under the Florida Constitution. *Id.* at 227.

fully request that the Senate excuse this court from further responding to Questions 2, 3, and 4 of the order.

4. *Summary.* We answer Questions 1 and 5 in the negative. We decline to answer Questions 2, 3, and 4 for the reasons advanced above.

The foregoing answers and opinions are submitted by the Chief Justice and the Associate Justices, subscribing hereto on the seventh day of July, 1992.

PAUL J. LIACOS
HERBERT P. WILKINS
RUTH I. ABRAMS
JOSEPH R. NOLAN
NEIL L. LYNCH
FRANCIS P. O'CONNOR
JOHN M. GREANEY